UNITED STATES of America, Plaintiff-Appellee,

v.

Walter PRITCHARD, Defendant-Appellant.

No. 83–1763.

United States Court of Appeals, Seventh Circuit.

Argued May 8, 1984.

Decided Oct. 4, 1984.

Daniel A. Dupre, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Donald T. Bertucci, Chicago, Ill., for defendant-appellant.

Before WOOD and ESCHBACH, Circuit Judges, and KELLAM, Senior District Judge.*

* The Honorable Richard B. Kellam, Senior District Judge of the Eastern District of Virginia, is sitting by designation.

**1114**

HARLINGTON WOOD, Jr., Circuit Judge.

Appellant Walter Pritchard was convicted in a bench trial of three counts (Counts I, III, and IV) relating to the unlawful possession of firearms in violation of 18 U.S.C. § 1202(a)(1) and 26 U.S.C. § 5861(d), and one count (Count II) relating to the unlawful possession of electronic equipment designed to be used primarily for the surreptitious interception of wire and oral communications in violation of 18 U.S.C. § 2512(1)(b). The district judge sentenced appellant to two years imprisonment on Counts II, III, and IV, the sentences to run concurrently, and imposed two years probation on Count I. On appeal, appellant argues that the affidavit presented to the magistrate for issuance of the search warrant contains numerous allegations which were known to be false or were included in the affidavit with reckless disregard for the truth. Appellant contends, therefore, that the magistrate and the trial judge erred in denying appellant's motion for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Appellant also argues that the affidavit provided an insufficient basis for finding probable cause to issue the search warrant for his residence and that the district court erred in denying his motion to quash the warrant. Finally, appellant maintains that the evidence at trial was insufficient to convict him beyond a reasonable doubt on all counts. We affirm.

## I.

We begin by summarizing the relevant evidence presented by the government, since it is the value and sufficiency of the government's evidence that appellant challenges. In early 1981, the FBI began an investigation of appellant's activities. As part of this investigation, the FBI undertook surveillance of appellant and relied on the services of two informants. One of the surveillances occurred on February 14, 1981, when Agents Bogan and Murray of the FBI entered a Chicago tavern to observe appellant. After about half an hour,

appellant approached the agents and struck up a conversation with them. According to Agent Bogan, appellant introduced himself as "Wally the Wiretapper" and claimed he was the second best wiretapper in Chicago. During the ensuing conversation, appellant allegedly boasted of his talents as a wiretapper and represented that he was presently available for wiretapping or similar services. He also stated that he owned a gun but did not have one on him at the time.

In addition to undertaking further surveillance of appellant from late January to early March, the FBI used two informants as contacts with appellant. One of the informants, whose identity was revealed as John Forbes, testified at trial. Forbes stated that he first met with appellant and a third party at a restaurant on March 7, 1981, at which time Forbes wore a body recorder to record their conversation. During their conversation, appellant discussed the monitoring of radio frequencies used by various law enforcement agencies in the greater Chicago area, and talked about various firearms and attachments he possessed and could procure. Forbes removed the body recorder after leaving the restaurant because appellant had mentioned that he owned a device capable of detecting within a certain area whether anyone was wearing electronic eavesdropping equipment. The three men thereafter went out to appellant's van, where Forbes observed three different sized cases. According to Forbes, the largest case contained electronics equipment used to circumvent alarm systems and to check line monitoring, meters, and alligator clips. In one of the other cases he saw a short barreled shotgun and an automatic pistol with a silencer.

Forbes met with appellant again on March 10, 1981. Forbes again taped their conversation, during which appellant told Forbes of a burglary he had committed in which he posed as a deliveryman to gain access to the residence. He also stated that the only time he carried a gun was when he entered the premises to be burglarized. At other points in their conversa-

tion, appellant talked about how he used silencers, sometimes to "waste" dogs during robberies, how he had tools for stealing cars, and how he had stolen but "cleaned up" his van.

Based on this information and other information obtained through FBI surveillances and informant #1 (whose identity has remained confidential), the FBI received warrants to search appellant's residence in Chicago and his van. The search of the residence, as stated in the warrant, was to be directed toward the discovery of

an electronic device known as a "blue box" used to circumvent long distance telephone call toll charges, which is actually black in color, approximately "palm-size," made of plastic, and has switches on top, which is a fruit, instrumentality, and evidence of violations of Title 18, United States Code, Section 1343 (wire fraud); and electronic wiretapping equipment, including electronic meters and devices resembling telephone receivers, which are fruits, instrumentalities, and evidence of violations of Title 18, United States Code, Section 2512(1)(b) (possession of wire communications intercepting devices).

On March 16, 1981, several agents of the FBI executed the search of appellant's residence. The entire search lasted approximately three hours. During the course of that search, the agents forced open a locked suitcase containing two pistols, a silencer, a short barreled shotgun, ammunition, handcuffs, and disguises. The agents also seized several electronic devices. The government's expert witness at trial, Agent Wilmore, described government exhibit 11 as a briefcase containing a tape recorder, an amplifier, a voice activation unit, a power source, and various patch cords. A microswitch was built into one of the latches of the briefcase, and a microphone was concealed in the briefcase handle. Agent Wilmore testified that when the tape recorder is connected to the microphone and placed in the record mode, and the briefcase latch is opened to activate the recorder, the device is capable of recording room conversations. He also stated that the voice activation unit in the briefcase could be adjusted so that the tape recorder would operate only when the microphone is actually picking up sounds. In Agent Wilmore's opinion, this system was one designed primarily for surreptitiously recording conversations.

Agent Wilmore also described government exhibit 12, which consisted of a briefcase with a built-in FM radio receiver and loop antenna, and a headphone for the radio receiver and a telescoping antenna. The radio receiver was set to pick up signals transmitted only at a frequency of 38.45 megahertz, which falls within the lower FM band corresponding to public service broadcasts rather than normal FM commercial broadcasts. Communications received through the receiver could be heard over the receiver's own speaker or through the headphones; they could also be played into the tape recorder found in government exhibit 11. Agent Wilmore testified that he could not say that the unit as found was one designed for surreptitious interceptions of communications. He did state, however, that certain metal studs on the tape recorder could be removed, and the recorder would then fit into the briefcase of government exhibit 12. The system would then function as one whose primary purpose was the surreptitious interception of communications, so long as an item found in the briefcase believed by Agent Wilmore to be a radio transmitter actually functioned as one. However, Agent Wilmore was unable to activate the alleged transmitter.

Finally, Agent Wilmore described government exhibit 13. This exhibit consisted of an attache case with a built-in FM radio receiver, a telescoping antenna, a concealed microphone on each of two sides near the top of the case, and a magnetic switch under the handle, which could supply power to the radio receiver when the handle of the case was placed in a certain position. The system could receive FM signals through the radio receiver or amplify audio signals received through the micro-

phones. Agent Wilmore testified that if the tape recorder found in government exhibit 11 were placed inside the case and connected to the radio to record room conversations, the unit would be a device primarily useful for the surreptitious interception of communications.

Prior to trial, appellant filed a variety of motions, including a motion for a *Franks* hearing and a motion to quash the search warrant of his residence. A magistrate denied appellant's motion for a *Franks* hearing and recommended that the motion to quash be denied. The district court undertook a *de novo* consideration of appellant's motion to quash and decided to accept the recommendation of the magistrate in its entirety. Appellant waived his right to a jury trial, and on February 24, 1983, the trial judge found appellant guilty on all counts. This appeal followed.

## II.

### A. Franks *Hearing.*

■ Appellant first contends that under the holding of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), he was entitled to a full evidentiary hearing on his motion to quash and suppress evidence. In *Franks*, the Supreme Court held that the fourth amendment requires an evidentiary hearing into the truthfulness of the allegation contained in an affidavit supporting an application for a search warrant "where the defendant makes a *substantial preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause ...." *Id.* at 155–56, 98 S.Ct. at 2676 (emphasis added). *Franks* makes clear that an affidavit supporting an application for a search warrant is presumed to be valid, *id.* at 171, 98 S.Ct. at 2684, and that the "substantial preliminary showing" that must be made to entitle the defendant to an evidentiary hearing must focus on the state of mind of the *affiant*, *id.* The proffered evidence must go to-

ward showing either that the *affiant* lied, or that the *affiant* recklessly disregarded the truth because "the affiant 'in fact entertained serious doubts as to the truth of his' allegations[,]" or had " 'obvious reasons to doubt the veracity' of the allegations." *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 732, 88 S.Ct. 1323, 1325, 1326, 20 L.Ed.2d 262 (1968)).

Appellant contends that he made the required "substantial preliminary showing" by raising in his motion to quash numerous factual inaccuracies contained in the affidavit supporting the search warrant application that demonstrate that the affiant, Agent Scigalski, knew the information given to him was false or that he included the information when he had obvious reasons to doubt it. We disagree. We believe that as to each of the alleged inaccuracies asserted by appellant, with the possible exception of one, which we find to be insufficiently substantial to undercut the validity of the search warrant as a whole, appellant has failed to provide the requisite substantial evidence that affiant Scigalski knew his allegations to be false or that he actually entertained substantial doubts as to the truth of the information or had obvious reasons to doubt its veracity.

The relevant portions of Agent Scigalski's affidavit are as follows:

2. This affidavit is made in support of the issuance of a search warrant for the premises described as apartment 903 of 3930 Pine Grove, Chicago, Illinois. The apartment is located in a multi-storied high rise building located on the northeast corner of the intersection of Pine Grove and Irving Park in Chicago, Illinois. The apartment is occupied by Walter Dewey Pritchard. Pritchard is a convicted felon, according to FBI records.

3. In connection with this investigation, I have personally reviewed files of both the FBI and of the Chicago Police Department which have described Pritchard as a suspected burglar and wiretapper.

4. On February 14, 1981, while acting in an undercover capacity, Special Agent Jeff M. Bogan of the FBI was told by Walter Dewey Pritchard that he was known as "Wally the Wiretapper" and that he (Pritchard) was the second best wiretapper in the business. Pritchard explained that he was second only to Richard Cain who had been murdered some years prior. Pritchard also explained that he owns a handgun.

5. Special Agents of the FBI conducted physical surveillances of Pritchard from January 31, 1981 until March 1, 1981. During this surveillance, Pritchard was observed meeting with Robert Siegel, a known burglar. On February 5, 1981 and again on February 10, 1981, Pritchard was also observed driving a 1979 Chevrolet Van bearing Illinois 1981 License 111638RV. On February 2, 1981, Pritchard drove this van to Earl Scheib Auto Paint Garage. The van was later observed exiting this garage painted a different color. During this surveillance, Pritchard using the above van was observed "casing" Kosinski's Jewelry Store located at 5754 W. Belmont on February 16, 1981, February 21, 1981 and February 22, 1981. On February 22, 1981, Pritchard was observed taking a tan suitcase and a grey attache-type case from the above-described van after parking it in the garage of the building where he resides.

6. During the week of February 1, 1981, Pritchard talked with a confidential source (source #1) who has furnished reliable information in the past on at least 5 occasions, which information has been corroborated through independent investigation and by other confidential sources and which has resulted in the identification of 3 individuals as the perpetrators of criminal acts. During Pritchard's meeting with source #1, Pritchard explained that he was an expert at circumventing burglar alarm systems and that he was presently in the process of recruiting a burglary team. Additionally, Pritchard explained that he was selling "blue boxes" which he de-

scribed as electronic devices used to circumvent the toll charges of long distance telephone calls made from public pay telephones. Pritchard showed Source #1 a "blue box".

7. During the week of February 1, 1981, Pritchard met with source #1 and displayed a tan suitcase which contained several electronic meters and other equipment resembling telephones. Pritchard explained that the electronic equipment contained in the suitcase was for the purpose of electronically eavesdropping on telephone conversations.

8. During the week of March 1, 1981, a confidential source (source #2) met with Pritchard. Source #2 has furnished reliable information on at least 10 occasions, which information has been corroborated through independent investigation and by other confidential sources and which has aided in the indictment of two individuals who are presently awaiting trial for robbery and murder. During this meeting Pritchard displayed an electronic device which he identified as "blue box" which he described as an electronic device used to circumvent the toll charges of long distance telephone calls made from public pay telephones. Pritchard explained that he would sell the above-described "blue-box" upon request.

9. During the week of March 1, 1981, Pritchard met with source #2 and explained that he was planning to burglarize a bank.

10. During the week of March 8, 1981, Pritchard telephoned source #2 and explained that he was calling long distance from a public pay telephone and that the cost of the call was being circumvented through the use of a "blue box".

11. During the week of March 15, 1981, source #2 observed Pritchard exit his vehicle and attach a device (which Pritchard had previously identified as a "blue box") to a public pay telephone.

12. During the week of March 15, 1981, Pritchard advised source #2 that

he resided in a high rise apartment building located at 3930 Pine Grove, apartment 903, Chicago, Illinois.

13. On March 12, 1981, Pritchard told source # 1 that the "blue box" and the equipment he uses to eavesdrop on telephone conversations were presently at his apartment and that he always keeps them there unless he is personally using them.

14. The physical surveillances in this Affidavit were either personally conducted by affiant or the affiant became aware of them by reviewing the surveillance reports prepared by the agents of the FBI who conducted the surveillances. Source # 1 personally advised affiant of the information in this affidavit which is attributed to Source # 1. Source # 2 personally advised another FBI agent who then advised affiant of the information in this affidavit which is attributed to Source # 2.

15. According to Source # 1 and Source # 2, the "blue box" used by Pritchard to circumvent toll charges on long distance telephone calls is actually black in color, approximately "palm-size," made of plastic, and has switches on top.

16. On numerous occasions during the physical surveillance of Pritchard described above, Pritchard was observed by affiant and other FBI agents entering and exiting the above-described building at 3930 Pine Grove, Chicago, Illinois.

Appellant first argues that affiant Scigalski's description of appellant in paragraph 3 as a "suspected burglar and wiretapper" is factually unsupported and, if not known to be outright false, was included in reckless disregard of the truth and for the purpose of giving the false impression that appellant was a wiretapper. Appellant points to an FBI memorandum that describes appellant as "a convicted federal felon and *believed* wiretapper." (Emphasis added by appellant.) We believe that any attempt by appellant to demonstrate that affiant Scigalski lied or acted recklessly on the basis that the FBI memorandum used the word "believed" and the affidavit used the word "suspected" is ludicrous. Appellant has provided no other evidence substantially showing that agent Scigalski knew this description was false or had any reason to believe it was false.

Appellant next challenges the veracity of one of affiant Scigalski's sources, Agent Bogan, who attributed to appellant the statements alleged in paragraph 4 that appellant was known as "Wally the Wiretapper" and was the second best wiretapper in the business. In support of his challenge, appellant offered his own affidavit and the affidavit of the bartender at the tavern where Agent Bogan and appellant met denying that these statements were ever made. Although appellant's own self-serving affidavit is clearly insufficient to warrant a *Franks* hearing on this issue, *see United States v. Reed,* 726 F.2d 339, 342 (7th Cir.1984), the bartender's affidavit directly contradicts Agent Bogan's assertions that the statements were made. The government argues, however, that the bartender's affidavit does not cast doubt on the extent of *affiant Scigalski's* knowledge at the time he swore to the affidavit; such evidence, the government claims, does not show how he, the affiant, was or should have been aware of this inconsistency.

In *United States v. Dorfman,* 542 F.Supp. 345 (N.D.Ill.1982), *aff'd sub nom. United States v. Williams,* 737 F.2d 594 (7th Cir.1984), the court noted that while allegations that an *informant,* whose story was recited by an affiant, was lying are insufficient to require a *Franks* hearing, this principle does not apply when one *government agent* deliberately or recklessly misrepresents information to a second agent, who then innocently includes the misrepresentations in an affidavit. This is the situation alleged here. *Id.* at 366 n. 18. We need not decide, however, whether the bartender's affidavit directly contradicting a government agent's story relied on as a source by the government affiant is the kind of "substantial preliminary showing" entitling a defendant to an evidentiary hearing. In this case, we believe that even

if the statements attributed to appellant were not made and therefore could not have been relied on to establish probable cause, the remaining allegations were sufficient to support the magistrate's finding of probable cause to issue the search warrant here. *See infra* Part B.

Several of appellant's other challenges relate to the veracity of allegations made in paragraphs 5, 6, 8, 9, 10, and 13 that refer to events not mentioned in FBI reports tendered to appellant during discovery. Appellant's argument apparently is that because these events were not recorded in the FBI surveillance reports made available to appellant, the events could not have occurred and were false or should have been known to be false by affiant. The government has never maintained, however, that the only source of its information were those surveillance reports made available to appellant. Furthermore, appellant has never made a showing that the events alleged in the affidavit did not in fact occur. Without a substantial preliminary showing of contrary facts, appellant's contentions are insufficient to warrant a *Franks* hearing.

Appellant also challenges the allegations in paragraphs 6, 8, 9, 10, and 13 of the affidavit on the ground that the statements made by the nongovernmental informants and relied on by affiant were false. As we have stated previously, however, it is the *affiant's* state of mind that is critical. Appellant has made no showing much less a substantial showing, that agent Scigalski knew or had reason to believe that the statements made by his *sources* were false.[1]

The fact that a third party lied to the affiant, who in turn included the lies in a warrant affidavit, does not constitute a *Franks* violation. A *Franks* violation occurs only if the affiant knew the third party was lying, or if the affiant proceeded in reckless disregard of the truth. Therefore, allegations that hearsay contained in a warrant application is false, or that an informant whose story was recited by an affiant was lying, are insufficient to require a *Franks* hearing, since the falsity or recklessness alleged is not that of the affiant, but of a third party.

. . . .

Furthermore, even when there is an allegation that the affiant knew the informant was lying, was reckless in reporting the story, or deliberately or recklessly misreported the informant's story to the court, the allegation must be accompanied by the required offer of proof.

*Dorfman*, 542 F.Supp. at 366.

Appellant's final two challenges are also without merit. Appellant contends that the allegation in paragraph 10 that he used a "blue box" or "black box" to circumvent long distance calls is false and must have been known to be false by the FBI. In support of this contention, appellant submitted personal telephone billings for long distance calls, copies of which were in the possession of the FBI. As the government correctly points out, however, the device in question is used to avoid charges from *public* pay telephones. Appellant's *private* telephone records are thus irrelevant. Finally, appellant claims that the informant's statement relied on in paragraph 11 that he saw appellant "attach ... a 'blue box' ... to a public pay telephone" was false and must have been known to be false by affiant because a "blue box" does not *attach* to a telephone; rather, it is a *hand held* device. Again, however, appel-

---

1. Part of appellant's challenge to paragraph 8 rests on the argument that affiant knew or should have known that the informant's statement was false because that statement conflicted with the informant's grand jury testimony. As the government points out in its brief, however,

> [d]efendant fails to note ... that the informant appeared before the grand jury on October 10, 1982. The search warrant affidavit

was prepared on March 16, 1981. Thus, even if the informant did lie to the grand jury in 1982, an accusation with no support in the grand jury transcript, that would have no relevancy to the *Franks* question: whether affiant knew the informant was a liar on or before March 16, 1981, or that affiant at that time included the informant's statements in the affidavit with reckless disregard for the truth.

lant does not argue that affiant knew the informant's statement to be false when made, or that it was accepted in reckless disregard of the truth. Moreover, we agree with the government that the difference between "attached to the telephone" and "held next to" a telephone is hardly the kind of material misrepresentation contemplated by *Franks.*

## B. *Sufficiency of the Affidavit for the Search Warrant.*

Appellant's next argument is that the affidavit failed to establish probable cause for the issuance of the search warrant by the magistrate. "Probable cause is established whenever there is a reasonable probability of finding the desired items in a particular location." *United States v. Rambis,* 686 F.2d 620, 622 (7th Cir.1982). We have stated that a magistrate's determination of probable cause is to be

> given considerable weight and should be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated.

*Id.; see also Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (citing *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)).

■ We conclude that the affidavit provided the necessary "substantial basis" for concluding that probable cause existed to issue the search warrant under the guidelines set forth by the Supreme Court in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates,* the Court abandoned its previous approach under *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), which required an exacting dissection of an informant's veracity, reliability, and basis of knowledge when an informant was relied on in the

affidavit. Instead, the Court adopted a "totality of the circumstances" approach that emphasizes the practical, nontechnical nature of probable cause and that "permits a balanced assessment of the relative weights of all the various indicia of reliability" of the particular facts presented to the magistrate. 103 S.Ct. at 2330.

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 2332.

Appellant complains that the only portions of the affidavit that arguably support probable cause for finding a "blue box" and wiretapping equipment at appellant's residence are the allegations based on information supplied by the informants, information that appellant contends was never sufficiently corroborated by the government and therefore cannot serve as an adequate basis for probable cause. Although it is true that the government was unable to corroborate independently certain specific observations made by the informants, there was other evidence, some of it specifically corroborative, that sufficiently established, under all the circumstances, the reliability of the facts on which the determination of probable cause was based. A review of police and FBI reports by affiant Scigalski revealed that appellant was a suspected wiretapper. This fact was corroborated when affiant's fellow agents, who plainly could be regarded as a reliable source by the magistrate, stated that in their meeting with appellant he had introduced himself to them as "Wally the Wiretapper" and the second best wiretapper in the business. In addition, FBI observations of appellant removing a "tan suitcase and gray attache-type case" from his van was consistent with informant #1's statement that appellant had earlier displayed to

him a tan suitcase containing several electronic meters and other equipment resembling telephones. Similarly, the address given by appellant to informant as his place of residence was corroborated by FBI surveillance. The evidence given by the confidential informant was also consistent with the evidence supplied by informant Forbes. "By telling consistent yet independent stories, the informants provide 'cross-corroboration,' and enhance the reliability of the application as a whole." *Dorfman*, 542 F.Supp. at 364. Finally, the reliability and credibility of the informants was established for the magistrate because their information was provided on the basis of personal knowledge and because they had previously provided accurate information to the government. *See United States v. Skramstad*, 649 F.2d 1259, 1262 (8th Cir. 1981). The combination of these factors is enough to justify reliance on the information provided by the informants, and, when combined with the FBI's own investigation, presented facts to the magistrate that, under the practical, commonsense approach articulated by the Supreme Court in *Gates*, adequately support the magistrate's finding of probable cause.

Appellant also contends that even if the allegations in the affidavit could somehow support probable cause for finding a "blue box" or *eavesdropping* equipment at appellant's residence, they could not support probable cause for finding *wiretapping* equipment, and while there are allegations in the affidavit referring to electronic *eavesdropping* equipment, eavesdropping equipment is *not* wiretapping equipment. We agree with the government, however, that this is precisely the kind of "hypertechnical" interpretation of affidavits es-

chewed by the Supreme Court in *Gates*, 103 S.Ct. at 2331 (quoting *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)), and by this court in *United States v. Gaertner*, 705 F.2d 210, 212 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984). The terms are not totally divorced, and the search warrant was issued for the seizure of items illegal under 18 U.S.C. § 2512(1)(b). This statute, which prohibits all devices primarily used for the surreptitious interception of wire or oral communications, includes eavesdropping equipment within its ambit. We conclude that the affidavit adequately supported the magistrate's probable cause determination.[2]

### C. Whether the Items to Be Seized Were Described with Particularity.

Appellant also challenges the search warrant as lacking particularity for the things to be seized. The warrant authorized the agents to seize a "blue box" (black in color, palm-sized, made of plastic, with switches on top) and electronic wiretapping equipment, including electronic meters and devices resembling telephone receivers. Appellant contends that because the warrant did not describe with greater particularity the type of electronic equipment that could be seized, the agents were left to their own discretion in deciding what to seize and in fact spent over three hours seizing every portable electronic item within appellant's residence, even going so far as to forcibly break into a locked container.

 A search warrant must describe the objects of a search with reasonable specificity; general warrants are prohibited by the fourth amendment. *See Andresen v. Maryland*, 427 U.S. 463, 479–82, 96 S.Ct.

---

**2.** Because we conclude that the affidavit adequately supported the magistrate's probable cause determination, we need not decide whether, if the warrant should not have been issued, the evidence obtained as a result of search could nonetheless have been admitted in light of the recent limitations placed on the exclusionary rule by the Supreme Court in *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon*, the Court held that the purposes of the exclusionary rule "will only

rarely be served" by applying it in cases in which officers have relied on a subsequently invalidated search warrant. *Id.* at 3423. The Court concluded that "[i]n the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.*

2737, 2748, 2749, 49 L.Ed.2d 627 (1976). We have recognized, however, that a reasonably specific warrant does not mean that the warrant must be "elaborately detailed," *United States v. Reed*, 726 F.2d 339, 342 (7th Cir.1984), or enable authorities "to minutely identify every item for which they are searching," *United States v. Prewitt*, 553 F.2d 1082, 1086 (7th Cir.), *cert. denied*, 434 U.S. 840, 98 S.Ct. 135, 54 L.Ed.2d 104 (1977). While warrants worded so vaguely as to allow officers to seize indiscriminately both relevant and irrelevant evidence have been held overbroad, *see, e.g., United States v. Abrams*, 615 F.2d 541 (1st Cir.1980); In re *Lafayette Academy, Inc.*, 610 F.2d 1 (1st Cir.1979), we believe the warrant here sufficiently hedged the exercise of the agents' discretion to survive fourth amendment scrutiny. Unlike warrants that have failed to distinguish the materials related to the specific crime under investigation, the warrant here described with detail only those items directly related to the crimes being investigated—wire fraud and possession of wire communications intercepting devices. Given the somewhat difficult task of delimiting the broad category of electronic equipment, we believe the government described the items to be seized with sufficient particularity to satisfy the heart of the fourth amendment's prohibition against overbroad searches.

■■■ As for appellant's objections to the scope and duration of the search, we cannot say that the search under all the circumstances was an unreasonable one. Certainly a search for small electronic devices justifies entry into containers in which they would fit and might reasonably be found. *See Reed*, 726 F.2d at 342. A thorough and extensive search was reasonably required to locate the items described in the warrant. The scope of the search conducted here easily passes constitutional muster. *See generally* Dix, *Means of Executing Searches and Seizures as Fourth Amendment Issues*, 67 Minn.L.Rev. 89 (1982).

## D. *Sufficiency of the Evidence on Count II.*

■■■ Appellant argues that the government's evidence at trial was insufficient to convict him beyond a reasonable doubt on Count II. Count II charged appellant with knowingly possessing certain specified electronics devices. In examining appellant's challenge to the sufficiency of the evidence, we must review all the evidence and all reasonable inferences that can be drawn from the evidence in the light most favorable to the government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The test is whether, after viewing the evidence in the light most favorable to the government, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). We have stated that it follows from this test that "when the factfinder is asked to draw conflicting inferences from the facts in evidence in order to choose between conflicting hypotheses, the reasonable doubt test requires the reviewing court to consider the evidence according to the prosecution's inferences." *United States v. Moya*, 721 F.2d 606, 610 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984).

The statute relating to Count II provides that "any person who willfully ... possesses ... any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire or oral communications" has committed a federal offense. 18 U.S.C. § 2512(1)(b). The phrase "electronic, mechanical, or other device" is defined in 18 U.S.C. § 2510(5) as "any device or apparatus which can be used to intercept a wire or oral communication," with certain inapplicable exceptions. It is clear from both the language and the legislative history of section 2512 that the statute was intended to focus on a relatively narrow category of devices and apparatus whose *design* renders them useful *pri-*

*marily for surreptitious* listening. *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 94–95, *reprinted in* 1968 U.S.Code Cong. & Ad.News 2112, 2183. The statute was not intended to prohibit the use of a device merely because it may be adapted to wiretapping or eavesdropping; by the same token, however, a device does not fall outside the ambit of the statute merely because it may have innocent uses. The inquiry is to be directed toward whether the device is designed in such a way that its "principal use is *likely* to be for wiretapping or eavesdropping." *Id.* (emphasis added).

We need not address appellant's arguments relating to the apparatus introduced as government exhibits 12 and 13; we believe that the apparatus comprising exhibit 11 alone provided a sufficient basis on which to convict appellant under section 2512. The exhibit 11 apparatus was a briefcase containing a tape recorder, an amplifier, a voice activation unit, a power source, and patch cords. A microswitch was built into a latch in the briefcase, and a microphone was concealed in its handle. Agent Wilmore, the government's expert witness, testified that when the tape recorder is connected to the microphone and set in the record mode, and the briefcase latch is opened to activate the recorder, the apparatus is capable of recording room conversations surreptitiously. He also stated that the voice activation unit found in the briefcase could be adjusted to activate the tape recorder only when the microphone is actually picking up sounds. In agent Wilmore's opinion, the apparatus was one designed to be used primarily for the surreptitious recording of conversation.

■ In our view, the evidence supports Agent Wilmore's and the trial judge's conclusion beyond a reasonable doubt that the apparatus was designed in such a way as to conceal its electronic components and make its principal use that of surreptitiously listening to oral communications. The

only arguments appellant makes applicable to the exhibit 11 apparatus are that the equipment was old, had not been used in some time, and was incapable of being used in a surreptitious manner because the components could not all fit into the case when it was closed. This last assertion finds no support in the record and is directly contradicted by Agent Wilmore's testimony. As for the contentions that the items were outdated and had not been recently used, they are irrelevant. The items were specifically combined into an apparatus designed primarily for the purpose of listening surreptitiously to oral communications. Possession of such a device falls within the purview of the statute.

E. *Sufficiency of the Evidence on Counts I, III, and IV.*

Appellant's final challenge is to the sufficiency of the government's evidence on the issue of whether appellant knowingly possessed the unregistered pistols, silencer, and short barreled shotgun contained in the locked suitcase found during the search of appellant's apartment.[3] At the time of the search, appellant stated that the suitcase was not his property and that he was holding it for someone else. Appellant contends that his denial, coupled with the absence of his fingerprints on the weapons and the FBI's failure to mention firearms in any FBI report or in the affidavit for the warrant and the warrant itself negated any inference that he had access to and knowledge of the firearms.

■ We believe that, viewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the government, a rational trier of fact could have found that appellant knowingly possessed the firearms at issue. It is the *possession* of firearms, rather than ownership, that is unlawful. *See United States v. Polk,* 574 F.2d 964, 965 (8th Cir.),

---

3. Count I of the indictment charged that appellant, having previously been convicted of a felony, knowingly possessed certain firearms in violation of 18 U.S.C. § 1202(a)(1). Counts III and IV of the indictment charged that appellant

knowingly possessed certain unregistered firearms in violation of 26 U.S.C. § 5861(d). The trial court found defendant guilty of all three counts.

*cert. denied,* 439 U.S. 849, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978). In addition, we have stated that, for purposes of 26 U.S.C. § 5861(d), "proof that a person actually or constructively possessed an unregistered firearm ... is sufficient proof that the person 'knowingly possessed' the unregistered firearm." *United States v. Taylor,* 728 F.2d 864, 869 (7th Cir.1984); *accord United States v. Shackleford,* 738 F.2d 776, 784 (7th Cir.1984). The fact that the firearms in question were seized during a search of appellant's residence in an area over which he exercised dominion and control is sufficient evidence from which to infer that appellant constructively possessed those weapons. *See Shackleford,* 738 F.2d at 785; *Taylor,* 728 F.2d at 869; *Polk,* 574 F.2d at 965. Furthermore, only nine days before the search, appellant stated during the taped conversation with informant Forbes that he possessed a short barreled shotgun and a silencer. When Forbes was invited into appellant's van, he saw a short barreled shotgun and a pistol and a silencer, and identified them as the same firearms seized during the search of appellant's residence. Finally, government agents testified that after they had seized the locked suitcase containing the firearms and showed it, unopened, to appellant, appellant muttered an expletive and became flushed.

This evidence amply supports a finding of knowing possession of the firearms. The absence of appellant's fingerprints on the firearms does not undercut this conclusion. As one of the government's witnesses stated, fingerprints are successfully obtained from articles only infrequently. Similarly, the government's failure to refer to the firearms in the affidavit or search warrant merely demonstrates that the search was to be directed only toward the discovery of electronic equipment. The FBI's alleged failure to mention firearms in any of their reports prepared prior to the search, even if true, is also insufficient to negate the strong inference of knowing possession suggested by the totality of the evidence viewed in the light most favorable to the government.

The judgment of the trial court is affirmed.

AFFIRMED.