**UNITED STATES of America, Plaintiff–Appellee,**

v.

**David Frank DUNCAN, a/k/a Harold Celline, Defendant–Appellant.**

No. 89–1087.

United States Court of Appeals, Seventh Circuit.

Argued June 7, 1989.

Decided Feb. 22, 1990.

---

Frederick J. Hess, U.S. Atty., Stephen B. Clark, Joel Merkel (argued), Asst. U.S. Attys., Office of the U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Robert G. Duncan (argued), Kansas City, Mo., for defendant-appellant.

Before COFFEY and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

COFFEY, Circuit Judge.

David Frank Duncan, also known as Harold Celline, appeals from a conviction for knowingly receiving visual depictions of minors engaging in sexually explicit conduct, transported and shipped in interstate and foreign commerce, in violation of 18 U.S.C. § 2252(a)(2). We affirm.

I

In 1986 the United States Customs Service established a national undercover operation code named "Operation Borderline" to target people involved in the importation of child pornography into the United States.[1] As part of Operation Borderline, the Customs Service, in cooperation with the Canadian Customs Service, established a false child pornography distribution operation located in Hull, Quebec, Canada. Locating the operation's office in Canada was important to the credibility of the operation because most child pornography distributors are located outside of the United States.

Operation Borderline's child pornography enterprise, operating under the name Produit Outaouais, designed a non-illustrated brochure offering for sale sets of photographs depicting minors engaged in sexually explicit conduct Customs had seized in prior investigations. The brochure itself was a combination of descriptions of photographs contained in other brochures previously disseminated by actual distributors of child pornography. For example Customs' brochure, published in both English and French, included several paragraphs taken directly from a former child pornography distributor in Stockholm, Sweden:

"Hello Lolita Collector: You have been recommended from a reliable contact in which you have done business with. Because you are a trusted and proven customer, we offer you these special selections.

As a serious collector, you are aware of the world-wide ban and intense enforcement on this type of material. Accordingly, what was legal and commonplace is now an "underground" and secretive service in order to continue serving collectors.

This environment forces us to take extreme measures to protect us and to ensure your delivery. We have been serving customers the world over for many years and we are continuing to do so. To continue, we offer these selections and delivery on the following basis only."

The next part of the brochure was taken directly from a former distributor of child pornography in West Germany:

"The following list of materials is not all we have to offer. You will receive additional lists, unless you choose not to, at a later date.

FOTOS: With boys and girls in sex action ... At the moment, the following magazine foto sets are available:

Lolita No. 31, 43, 51, 52, 55
Incest No. 1, 2, 4 and 5
School Girls and Boys
Linda and Patty

---

1. Operation Borderline is the same undercover operation involved in our recent decision in

*United States v. Kalinowski,* 890 F.2d 878 (7th Cir.1989).

Lolita Colours Special No. 13, 18, 19 and 20

Lolitas Who Love Pissing

Nymph Lover No. 4 and 6

Loving Children No. 3

Lesbian Lolita

Liza and Her Dog

Sweet Linda" [2]

An additional section of the brochure offered COQ foto sets. COQ formerly was the largest distributor in the world of male homosexual child pornography. The section read as follows:

"COQ's favorites: Young Boys in Sex Action Fun:

\*     \*     \*     \*     \*     \*

Loverboys # 1, 2

Joe & His Uncle

Miniboys # 2, 4, 7

\*     \*     \*     \*     \*     \*

Joyboy # 4, 5"

The brochure contained an order form which could be torn from the rest of the brochure and mailed to the company to obtain desired photo sets.

Customs agents sent this brochure to around 2,000 people whose names were obtained from Customs' lists of persons from whom child pornography had been seized and from a list of individuals who stated preferences for particular types of child pornography in a Postal Inspection Service survey, that had been conducted under the false name of "Crusaders for Sexual Freedom." [3] Because the name "Harold Celline" could be found on both of these lists, Celline was sent a copy of the brochure. About 215 replies to the brochure were received, including one from "Harrald Celline." Celline's reply consisted of the brochure's order form containing his request for four sets of twelve photographs that were entitled: "Joe and His Uncle," "School Girls and Boys," "Chicken No. 11" and "Miniboys No. 7." The order form requested that the materials be shipped to Harrald B. Celline at 306A South Oakland in Carbondale, Illinois. Enclosed with the order form was a check for $60, payable to Produit Outaouais, drawn on the account of David F. Duncan, Southern Illinois University, Department of Health Education. The memo portion of the check noted "For Harry Celline."

In accordance with Operation Borderline's standard procedures, the Canadian Customs Service forwarded Celline's order to United States Customs in Chicago. Customs personnel in Chicago thereupon prepared Celline's order from Customs' stock of previously seized child pornography. Customs agents placed the 48 photographs Celline had ordered in an envelope and hand carried the envelope to Ottawa, Ontario, Canada. From there the envelope was sent from "Revenue Canada Customs/Excise" to a Special Customs Agent in St. Louis, Missouri. St. Louis based Special Customs Agent, Brett Braaten took the material from DHL's St. Louis office on May 29, 1987.[4] At about the same time, Customs in Chicago caused a form letter to be sent to Celline, purportedly from Produit Outaouais, requesting the best day and time for delivery of Celline's order. Celline replied that any day would be acceptable, that delivery should take place between 10:00 a.m. and 1:00 p.m., and that he would be out of town until June 18, 1987. On June 18, 1987, prior to delivering the material to Celline, Customs obtained a warrant to search Celline's home.

---

2. The numbers following the titles refer to a specific issue in a series of child pornography magazines.

3. The United States Postal Inspection Service's "Crusaders for Sexual Freedom" survey involved a questionnaire that was mailed to individuals whose names had appeared on previous Customs Service pornography seizure lists. Harold Celline had received a survey because an advertisement from a Danish child pornography enterprise, COQ, addressed to Celline had been the subject of a Customs seizure. The questionnaire asked respondents to state their preferred sexual materials, and Celline responded that his highest preference was for pre-teen sex-homosexual material. The Postal Inspection Service provided the information concerning Celline's response to the Customs Service sometime during the early part of 1986.

4. After receiving the envelope from DHL, Agent Braaten took the photographs from the envelope, inventoried them and returned them to the envelope.

On June 23, 1987, Agent Braaten delivered the requested child pornographic materials to Celline's home address while disguised as a DHL delivery man. The defendant, David F. Duncan, answered the door when Braaten knocked on it, received the package, and signed a delivery receipt for it in the name of D.F. Duncan.

About ten minutes after the photo sets were delivered, Braaten and several other agents executed the search warrant at Duncan's residence. The government agents seized 47 of the 48 originally delivered photographs, as well as dozens of other magazines and photographs. Among the confiscated child pornographic materials were: 163 pictures of boys under the age of 18 involved in sexually explicit conduct and 20 magazines containing males under 18 years old engaged in sexually explicit conduct.[5] Seven of the magazines had on their covers the inscription "COQ," and one of these magazines was entitled "Joyboy." As noted previously, COQ materials were among those Customs offered in the Produit Outaouais brochure, likewise "Joyboy" was also one of the titles listed in this brochure. In addition, the agents seized an illustrated child pornography brochure and an accompanying order blank. The order blank had been signed "Dave Duncan" and reflected an order for five items that corresponded to the following descriptions in the brochure: (1) Twelve Photos—The Best Place for a Boy to Masturbate is Out in the Open; (2) A Group of Six Photos—Oral and Anal Sex Between Two Handsome Suntanned Sexual Maniacs; (3) Ten Photos—Papiet and a Friend—A Country Sex Duet with Stallion Cocks; (4) Papiet—Fifteen Photos—The Laughing Farm Boy Radiating Happiness and Health; (5) Andy—Five Photos—The City Boy Who Turned Punk Possesses Mystic Erotic Aura. The order blank was entitled "COQ International Photo Sets," and listed a Holbaek, Denmark address.

At the time of the search, Duncan gave a statement to Agent Braaten after Duncan had been read his *Miranda* rights from a pre-printed form and had an opportunity to read a printed statement of his *Miranda* rights. Thereafter Duncan signed a written waiver of his *Miranda* rights. During questioning Duncan stated that the items delivered had been misrepresented, as he had thought the items would be "naturist" pictures rather than child pornography. Duncan also stated that he had previously used the name Harry Celline as a pen name in writing and that he used it in ordering materials because nudism is not acceptable in America. Duncan also admitted that Customs had previously seized items he had ordered. Duncan further admitted that he had received items from a company in Holbaek, Denmark in 1982.[6]

## II

Duncan challenges his conviction on the ground that the government's activities constituted "outrageous governmental conduct" violative of due process. In *United States v. Nunez–Rios*, 622 F.2d 1093, 1098 (2nd Cir.1980), the United States Court of Appeals for the Second Circuit held that "under Rule 12(b)(2) [of the Federal Rules of Criminal Procedure], this defense should normally be raised prior to trial, so that the trial court can conduct a hearing with respect to any disputed issues of fact." We agree with the Second Circuit that an outrageous governmental conduct defense must be made the subject of a pre-trial motion under Rule 12(b)(2). Not only did Duncan fail to make the outrageous governmental conduct defense the subject of a pre-trial motion, but in fact he failed to raise it in the trial court. In

---

5. The Government presented testimony from Dr. James Anthony Monteleone, M.D., Professor of Pediatrics at St. Louis University Medical School, who is board certified in pediatric endocrinology. Based upon his medical opinion and training, he testified that the pictures the Government had delivered to Duncan depicted children under the age of 18. He also testified that the other items of child pornography that were seized from Duncan and received in evidence at trial depicted children under the age of 18.

6. As noted in the previous paragraph, Holbaek, Denmark, according to the order blank Duncan had filled out, was the location where orders for COQ International materials were to be sent.

*United States v. Fuesting*, 845 F.2d 664, 670 (7th Cir.1988); we noted the limited review that can be accorded an argument in a criminal case that is raised for the first time on appeal:

> "[Fuesting's] argument was raised for the first time on appeal, and while it is within our discretion to resolve such issues, our review is limited to the strict standards of the plain error doctrine of Fed.R.Crim.P. 52(b). Under that doctrine, only an error which would result in an 'actual miscarriage of justice' would support reversal of Fuesting's conviction."

(Citations omitted). Thus, Duncan's failure to bring his alleged outrageous governmental conduct defense to the district court's attention means that we review this question under the narrow strictures of the "plain error" doctrine.

■ We initially turn to the question of whether the government's conduct could be considered "outrageous" under the law as currently developed. In *United States v. D'Antoni*, 874 F.2d 1214, 1219 (7th Cir. 1989), we recently observed that:

> "This court previously has noted that there is doubt as to the validity of the outrageous governmental conduct doctrine. *United States v. Bontkowski*, 865 F.2d 129, 131 (7th Cir.1989). This doctrine stems from a statement in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1978), in which the Supreme Court noted that it might 'some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.' *Id.* at 431–32, 93 S.Ct. at 1643; *see also Bontkowski*, 865 F.2d at 131; *United States v. Valona*, 834 F.2d 1334, 1343 (7th Cir. 1987). Like the Supreme Court, this circuit also has left the possibility open, although we have never reversed a conviction on this ground. *Valona*, 834 F.2d at 1343 (quoting *United States v. Swiatek*, 819 F.2d 721, 725 (7th Cir.), *cert. denied*, [484] U.S. [903], 108 S.Ct. 245, 98 L.Ed.2d 203 (1987)).

> Whether the Supreme Court itself ultimately will validate the doctrine of outrageous governmental conduct seems doubtful. In *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), a three justice plurality opined that '[t]he remedy of the criminal defendant with respect to the acts of governmental agents, which far from being resisted, are encouraged by him, lies solely in the defense of entrapment.' *Id.* at 490, 96 S.Ct. at 1650; *see also Bontkowski*, 865 F.2d at 132; *United States v. Williams*, 858 F.2d 1218, 1225 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989)."

Not only have we questioned the validity of the doctrine of outrageous governmental conduct, we have also observed that "due process grants wide leeway to law enforcement agencies in their investigation of the crime. Assuming that no independent constitutional right has been violated, governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant." *United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983). As we also observed in *Kaminski:*

> " 'In seeking to detect and punish crime, law enforcement agencies frequently are required to resort to tactics which might be highly offensive in other contexts. Granting that a person is predisposed to commit an offense, we think that it may safely be said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process ...' "

*Kaminski*, 703 F.2d at 1009 (quoting *United States v. Quinn*, 543 F.2d 640, 648 (8th Cir.1976)).

We have previously validated law enforcement undercover operations like that involved in this case. In *United States v. Thoma*, 726 F.2d 1191 (7th Cir.1984), we were also confronted with a child pornography sting operation. We noted that:

"Although there is no set formula for determining when Government conduct transgresses the boundaries of permissible investigative techniques, there are some recognized factors. When the Government supplies contraband, or becomes intimately involved in its production, then we will examine its conduct closely.... Similarly, we will closely examine those cases in which the Government misconduct injures third parties in some way."

(Citations omitted). In our case, as in *Thoma*, there was no injury to innocent third parties as the government merely sent Duncan copies of previously seized child pornography. Although the government did provide contraband to Duncan, this does not in and of itself render the government's conduct outrageous. In *United States v. Valona*, 834 F.2d 1334, 1344–45 (7th Cir.1987), we approved governmental action supplying contraband to a defendant during the course of an undercover drug investigation:

"It is clear that the government may supply drugs to a suspect in a drug investigation. *Hampton v. United States*, 425 U.S. 484, 491, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (Powell, J., concurring) (defendant supplied with actual contraband convicted of selling). This is especially true where the government supplied only a small amount. *United States v. Buishas*, 791 F.2d 1310, 1314 (7th Cir.1986) (supplied with sixty-nine gram sample of marijuana, which was not the contraband the defendant was convicted of conspiring to sell).... [I]n such cases we ... consider the practical necessity of this type of police work. Large scale drug stings will likely not succeed without the provision of small samples, a typical preliminary stage in such drug trafficking."

As in *Valona*, effective enforcement of laws involving the "consensual" crime of receiving child pornography shipped in foreign or interstate commerce will generally require, as a practical necessity, the controlled delivery of items of contraband to individuals, like Duncan, who are predisposed to commit this crime.

A decision that the Customs Service's conduct was not "outrageous" is directly supported by the Third Circuit's decision in *United States v. Driscoll*, 852 F.2d 84, 85–87 (3rd Cir.1988). In *Driscoll*, as in this case, government authorities, operating under the guise of a foreign child pornography business, sent the defendant a brochure offering to sell child pornography magazines. The defendant "ordered five magazines so explicitly described in the brochure as to leave no doubt that they contained child pornography." 852 F.2d at 85. As in our case, government agents made a controlled delivery, executed a warrant and "found materials containing child pornography, including the issue of [the magazine] that had been ordered pursuant to their solicitation." *Id.* The Third Circuit concluded that:

"In this case, the Postal Service agents merely offered to sell and then sold Driscoll a magazine. Their conduct thus approximates the conduct that survived due process challenges in *United States v. Jannotti*, 673 F.2d 578 (3d Cir.) (in banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), and *United States v. Thoma*, 726 F.2d 1191 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). In *Thoma*, a case also involving use of the mails to transport pornography, the Postal Service's undercover operation made numerous attempts to solicit defendant's participation in its fictitious child pornography organization before the defendant responded to the solicitations. In rejecting defendant's due process argument, the court held that the undercover organization 'was nothing more than an undercover operation of an inherently clandestine activity and did not constitute Government misconduct, much less violate defendant's right to due process.' *Id.* at 1199. In *Jannotti*, a case involving the ABSCAM investigations designed to locate public officials susceptible to bribery, the agents handed over substantial amounts of cash to buy influence; we distinguished [*United States v. Twigg*, 588 F.2d 373 (3d Cir.1978)] on the

ground that in *Twigg* the government set up, encouraged, and provided technical expertise to defendant whereas in *Jannotti*, it 'merely created the fiction that it sought to buy the commodity—influence—that the defendants proclaimed they already possessed.' 673 F.2d at 608. In view of the precedent, we conclude that the government's conduct here simply does not approach the level of outrageousness necessary to raise a valid due process defense."

*Driscoll*, 852 F.2d at 86. In light of our own precedent on the question of "outrageous governmental conduct" and the decision of the Third Circuit in *Driscoll*, we conclude that the district court did not commit "plain error" in refusing to recognize an "outrageous governmental conduct" defense.

### III

■ Duncan also challenges his conviction on the ground of insufficiency of the evidence. Duncan does not contest the fact that he received child pornography that had been shipped in interstate commerce. Rather, he asserts that he lacked prior knowledge of the fact that the photographs he had ordered were to depict children engaged in sexually explicit conduct.

"In evaluating [Duncan's] sufficiency of the evidence challenge, we note that he bears a heavy burden. Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.' " *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984)). "The test is whether after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Pritchard*, 745 F.2d at 1122 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

" 'As we emphasized in *United States v. Giangrosso*, 779 F.2d 376, 382 (7th Cir. 1985): *'[T]his court is not the trier of fact and we are required to uphold the [trier of fact's] verdict where "any rational trier of fact" could have found the defendant guilty of the crime.'* ... 'Only when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' Nesbitt*, 852 F.2d at 1509 (quoting *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied*, [486 U.S. 1009], 108 S.Ct. 1738 [100 L.Ed.2d 202] (1988) which quoted in turn, *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985)) (emphasis added)."

*United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988). A trier of fact may properly consider both direct and circumstantial evidence in reaching its determination. As we observed in *United States v. Grier*, 866 F.2d 908, 923 (7th Cir.1989):

" 'Not only is the use of circumstantial evidence permissible, but "circumstantial evidence 'may be the sole support for a conviction.' " ' *United States v. Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). ' "Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." ' *Williams*, 798 F.2d at 1039 (dissenting opinion) (quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir.1974)). *See also Wisconsin Jury Instructions—Criminal, No. 170* ('[C]ircumstantial evidence may be stronger and more convincing that (sic) direct evidence'). '[T]he evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley*, 707 F.2d 622 (1st Cir.1983)).' [*United States v.*] *Koenig*, 856 F.2d [843] at 854 [ (7th Cir.1988) ]."

In weighing both direct and circumstantial evidence

"[Triers of fact] are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See [United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986)]. While '[c]ommon sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.' *Id.*"

*Nesbitt,* 852 F.2d at 1511.

The record is replete with evidence that provided a basis for a reasonable jury to conclude beyond a reasonable doubt that Duncan knowingly ordered and subsequently received material depicting children engaged in sexually explicit conduct. The brochure the Customs Service sent to Duncan plainly and unambiguously advertised for sale photographs of "boys and girls in sex action" and "[y]oung boys in sex action fun." In addition, the brochure noted the "worldwide ban and intense enforcement" and the "underground" nature of the dissemination of this material, facts that placed Duncan on notice that the materials ordered were not innocent. Moreover, titles that in the context of the entire brochure scream "child pornography," such as "School Girls and Boys," "Lolita," "Loving Children," and "Joyboy," were sufficiently clear and sufficiently explicit to make anyone, let alone Duncan, a collector of this material and a college professor assumed to be above average in intelligence, aware of the fact that child pornography was being offered. Furthermore, Duncan's own personal order, in the name of Harrald Celline, was for photo sets of "School Girls and Boys," "Joe and His Uncle," "Miniboys No. 7" and "Chicken No. 11." Certainly, at least some of these titles would have placed Duncan on notice that he was ordering child pornography. In addition, to this evidence, the jury was made aware of the fact that Customs' search of Duncan's residence resulted in the seizure of many other items depicting children engaged in sexually explicit behavior. These items included materials from COQ, formerly a large scale purveyor of homosexually oriented child pornography. COQ items were some of those offered in the brochure Customs sent to Duncan, and Duncan was found to have possessed a copy of "Joyboy," one of the magazines Customs had offered in its brochure. In addition, Customs had previously seized an advertisement from COQ that had been sent to Duncan in the name of "Harold Celline." Furthermore, Customs also seized a brochure and accompanying order blank for COQ child pornography material that was illustrated and described the contents of the material with sexually explicit language. Duncan had already filled out in his own name the order blank requesting five items of the COQ material. Finally, evidence was received that Duncan had completed a "Crusaders for Sexual Freedom" survey in the name of "Harold Celline," that had been returned to the Postal Inspection Service and that stated that his highest preference was for "pre-teen sex-homosexual" material.

The jury was confronted with evidence of a brochure that reflected an offer of child pornography and Duncan's order of photo sets with titles that, in the context of the brochure, clearly denoted child pornography. The jury also received evidence of Duncan's possession of vast amounts of child pornography in his residence, including an illustrated COQ child pornography brochure that described the involved material in sexually explicit language. The above evidence, together with Duncan's possession of a completed order blank for the COQ material and Duncan's statement of preference for pre-teen, homosexual material in the "Crusaders for Sexual Freedom" survey, could very logically lead a reasonable jury to conclude that Duncan knowingly received depictions of minors engaged in sexually explicit conduct that had been transported in interstate and foreign commerce.

We agree that the trial court's failure to consider an outrageous governmental conduct defense was not plain error and also conclude that there was sufficient evidence to support Duncan's conviction. Thus, the judgment of conviction is

A FFIRMED.