**UNITED STATES of America, Appellee,**

v.

**Geoffrey Richard RUGH, Appellant.**

**No. 92–1114.**

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1992.

Decided July 7, 1992.

Douglas B. Altman, Minneapolis, Minn., argued, for appellant.

Jeffrey S. Paulsen, Minneapolis, Minn., argued, for appellee.

Before McMILLIAN, JOHN R. GIBSON, and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

Geoffrey Richard Rugh appeals his sentence, and challenges the district court's [1]

---

1. The Honorable Edward J. Devitt, Senior United States District Judge for the District of Minnesota (deceased).

refusal to suppress evidence found at his home linking him to the receipt of child pornography through the mail in violation of 18 U.S.C. § 2252(a)(2) (1988). We affirm the district court's determination that search warrant information was stale, but the *Leon* good-faith exception to the exclusionary rule applies. We further affirm the trial court's refusal to "group" the child pornography counts in sentencing.

## I.

Sergeant John Talbot of the South Lake Minnetonka, Minnesota, Police Department opened an investigation on Rugh on May 8, 1990. The investigation was prompted by a call from Detective Bob Nalett of the San Jose, California, Police Department, who informed Talbot that a search in San Jose revealed child pornography at the home of Damien Derringer. The items found at Derringer's home included letters from an Excelsior, Minnesota, address indicating that a resident at that address was engaged in producing and distributing child pornography, and was sexually abusing a thirteen-year-old boy.

Specifically, Nalett reported finding envelopes bearing a return address of 25695 Wildrose Lane, Excelsior. Those envelopes—the most recent of which was postmarked in 1988—contained letters indicating that thirteen-year-old Tommy Howitz resided at the Excelsior residence and was being molested by his father "Roger Howitz"[2] and others. The letters stated that Roger Howitz was planning to send his thirteen-year-old son to San Jose to become a sexual partner for Derringer. The letters also indicated that Roger Howitz was engaged in a profitable, nationwide child pornography distribution business. Finally, the envelopes contained photographs of prepubescent boys exposing their genitals, and twelve- to thirteen-year-old boys engaged in sodomy, masturbation, and oral copulation of the anus. Nalett told Talbot that he believed letters purport-

edly written by Tommy Howitz and Roger Howitz were written by the same person, an adult. Detective Nalett further informed Talbot that a check of postal records revealed that a person named Howitz lived at 25695 Wildrose Lane.

Police conducted further investigation before seeking a search warrant for Rugh's home that same day. South Lake Minnetonka police ran checks on the license plates of two vehicles parked at the Wildrose Lane address. The vehicles were registered to Thomas Russell Howitz and Rugh. Property records revealed the home was owned by Rugh and the phone book listed the residence as Rugh's. A check of the Minnetonka School District records, however, revealed no teenage children named Howitz registered in the schools. In his investigatory report, Talbot said he believed there were no children at the Wildrose address.

In his search warrant affidavit, Talbot requested permission for a nighttime search because "there could be a child involved and that child could be in danger if this warrant is not served as soon as possible." Later the night of May 8, 1990, South Lake Minnetonka police, joined by a federal postal inspector, executed a search warrant at the Wildrose Lane address. The search uncovered a large quantity of child pornography, including photographs and videotapes, a video camera with a zoom lens, correspondence with other pedophiles, and approximately $36,000 in cash.[3] The search also uncovered records linking Rugh with the falsification of social security information.

Correspondence found at Rugh's home included letters from Randy Anderson of Aurora, Illinois, that contained child pornography and statements that Anderson had sexually abused a fourteen-year-old boy. While executing a search warrant at Anderson's apartment in Illinois, officers encountered a fourteen-year-old boy who was the subject of some of the pictures

**2.** The investigation ultimately revealed that Roger Howitz was a pseudonym for Rugh. The name was an adaption of the name of Rugh's roommate, Russell Howitz.

**3.** Rugh was charged in state court with embezzling approximately $368,000 from a restaurant where he worked as night auditor. He was convicted in state court of embezzlement.

found in Rugh's apartment. Anderson admitted sexually abusing the boy and sending pictures of the boy to Rugh.

Rugh was charged with two counts of receiving child pornography through the mail in violation of 18 U.S.C. § 2252(a)(2) (1988), and four counts of social security fraud. The social security fraud counts stemmed from a scheme by Rugh and his roommate to use each other's names and social security numbers at their respective jobs.

Rugh moved to suppress the evidence seized during the search of his home, claiming information in the search warrant was stale. The district court agreed the information was stale, but refused to suppress the evidence, concluding that officers acted in good-faith reliance on a facially valid warrant. Rugh subsequently pleaded guilty to all six counts, reserving the right to appeal the district court's denial of his motion to suppress.

On appeal, Rugh contends the district court erred in applying the good-faith exception to the exclusionary rule enunciated in *United States v. Leon*, 468 U.S. 897, 913, 104 S.Ct. 3405, 3415, 82 L.Ed.2d 677 (1984). Rugh also challenges the district court's refusal to group the two § 2252(a)(2) counts for sentencing purposes.

## A. *Leon* Good–Faith Exception

The district court ruled the search warrant invalid, finding that probable cause to search Rugh's home was lacking because police failed to freshen the sixteen-month-old information found in San Jose. *United States v. Rugh*, Nos. 3–91–70 and 3–91–71(1), slip op. at 3–4 (D.Minn. Aug. 12, 1991). The government does not challenge this finding on appeal. The district court determined that evidence seized during the search should not be suppressed, however, because officers executing the warrant acted in good-faith reliance on a facially valid warrant. *Id.* at 4 (citing *Leon*, 468 U.S. at 919–20, 104 S.Ct. at 3418–19).

■ When police objectively and reasonably believe that probable cause exists to conduct a search based on an issuing judge's determination of probable cause, evidence seized pursuant to the ultimately invalid search warrant need not be suppressed. *United States v. Simpkins*, 914 F.2d 1054, 1057 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 997, 112 L.Ed.2d 1081 (1991). In assessing the good faith of officers in conducting a search, the court must look at the totality of the circumstances, including information known by officers but not presented to the issuing judge. *Id.* The district court's determination that police officers acted in good faith on a facially valid warrant is a mixed question of law and fact. We therefore review this finding de novo. *Id.* at 1057–58.

Rugh contends officers executing the search warrant could not have believed in good faith that probable cause for the warrant existed because their investigation was inadequate. Specifically, Rugh asserts that officers concluded before the search that no child was present at the home. Therefore, since no child was present, there was no rationale for the immediate search and police should have been required to update the evidence that child pornography remained at the home sixteen months after Rugh mailed the letters found in San Jose.

■ The district court found that the officers executing the search of Rugh's home acted in good faith because: (1) officers reasonably could have believed a child was being abused at the home and, therefore, time was crucial in executing the search warrant; (2) the officers could have reasonably believed a nationwide child pornography distribution ring was being run from the home; and (3) the officers reasonably could have believed the material from 1988 would still be present because pedophiles typically retain child pornography for a long time. *United States v. Rugh*, Nos. 3–91–70 and 3–91–71(1), slip op. at 4–5 (D.Minn. Aug. 12, 1991). We agree.

The affidavit supporting the search warrant as well as Talbot's testimony during the suppression hearing provide numerous facts to support an objective belief that probable cause existed to search Rugh's home. First, while Talbot thought that Rugh's child was not present at the home,

he could not be certain that the child, who would have been about fifteen at the time of the search, was not in the residence and subject to further abuse. *United States v. Rugh*, Nos. 3–91–70 and 3–91–71(1), tr. of motion proceedings at 9 (D.Minn. July 29, 1991). Rugh's letters stated that he and others had been abusing the boy since the age of five and that Rugh planned to send the boy to California to become a sexual partner for Derringer.

■ Second, Rugh's letters indicated that he was conducting a successful, nationwide distribution ring for child pornography. Where the affidavit recites facts indicating the presence of an ongoing, continuous criminal enterprise, the passage of time between the receipt of information and the search becomes less critical in assessing probable cause. *United States v. Jones*, 801 F.2d 304, 314 (8th Cir.1986); *United States v. Williams*, 897 F.2d 1034, 1039 (10th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 2064, 114 L.Ed.2d 469 (1991). Finally, Talbot stated it was his expert opinion that pedophiles retain child pornography for a long time. The information provided by Talbot supports the finding that Talbot believed Rugh to be a pedophile and that Talbot believed Rugh would have retained child pornography at his home some sixteen months after the latest evidence linking him to distribution of the material.

Rugh cites *United States v. Weber*, 923 F.2d 1338 (9th Cir.1991), in support of his argument that the police information was fatally stale, and that generalized beliefs about tendencies of pedophiles to retain literature are not sufficient to foster a good-faith belief in the sufficiency of probable cause. In *Weber*, the Ninth Circuit held that twenty-month-old information linking the defendant to receipt of child pornography could not provide probable cause for a search of defendant's residence. *Id.* at 1344–46. Moreover, the court held that generalized statements about the proclivities of pedophiles to retain child pornography for a long time did not warrant a good-faith belief by officers that probable cause existed to search the home. The court held the generalized statements about tendencies of pedophiles were without foundation because no evidence was submitted that the defendant was a pedophile. *Id.*

Unlike *Weber*, Talbot presented facts to support the conclusion that Rugh fit the definition of pedophile. Talbot presented evidence that Rugh claimed to have abused his son since the boy was five years old, and claimed to operate a nationwide child pornography distribution ring. Therefore, expert opinion as to the proclivities of pedophiles to retain literature was relevant to Talbot's belief in the probable cause to search the home. In *United States v. Rabe*, 848 F.2d 994, 995–96 (9th Cir.1988), the Ninth Circuit refused to suppress evidence when expert opinion as to the proclivities of pedophiles to retain literature was combined with facts indicating the targeted suspect was a pedophile.

■ A delay in executing a search warrant may make probable cause fatally stale. But the lapse of time is not always the controlling factor. Other factors must also be considered, including the nature of the criminal activity involved and the kind of property subject to the search. *Williams*, 897 F.2d at 1039. In this case, police could have reasonably believed that Rugh was a pedophile and had retained child pornography for an extended period. Police could also have reasonably believed that Rugh continued to operate a child pornography distribution ring from his home. Finally, police were justified in acting with speed based on the reasonable belief that a child was present in the home and subject to continuing abuse. Since time was critical in conducting the search, it was objectively reasonable for Talbot to conduct the search on the same day that he received information leading him to Rugh's home. Therefore, the totality of the circumstances show that there were sufficient facts to establish an objectively reasonable belief that probable cause existed to search the Rugh home.

## B. Sentencing

Rugh challenges the district court's failure to group the child pornography counts

for sentencing purposes. Without grouping, Rugh's total offense level was 14. With a criminal history category I, Rugh had a sentencing range of 15 to 21 months. If the district court had grouped the two child pornography counts, Rugh's total offense level would have been 12. With a criminal history category I, Rugh's sentencing range would have been 10 to 16 months. The district court said the dispute was minor and sentenced Rugh to 15 months imprisonment, a figure within both guidelines ranges.[4]

■■■ We review de novo a district court's determination on the grouping of offenses. *United States v. Manuel*, 912 F.2d 204, 206 (8th Cir.1990). Section 3D1.2 of the United States Sentencing Guidelines groups certain offenses for sentencing purposes in order to prevent multiple punishment for substantially similar conduct. U.S.S.G. Ch. 3, Pt. D Introductory Comment. Therefore, "[c]onvictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct that is not otherwise accounted for by the guidelines. In essence, counts that are grouped together are treated as constituting a single offense for purposes of the guidelines." *Id.* The primary focus in determining whether counts involve substantially the same harm, and therefore should be grouped, is whether the counts involve the same victim and the same act or transaction. U.S.S.G. § 3D1.2. The term victim under § 3D1.2 "is not intended to include indirect or secondary victims." U.S.S.G. § 3D1.2,. Comment. 2.

The two child pornography charges against Rugh stemmed from the receipt in the mails of two pictures depicting child pornography from Randy Anderson in Illinois. Rugh received the pictures on separate occasions, February 22, 1990, and March 10, 1990. The pictures received on each occasion depicted different children.

Rugh argues that the district court should have grouped the two child pornography counts under U.S.S.G. § 3D1.2 be-

cause the same victim was involved in both counts. Even though different children were depicted in the pictures, Rugh contends the primary victim under 18 U.S.C. § 2252(a)(2) was society, citing *United States v. Toler*, 901 F.2d 399, 403 (4th Cir.1990). In *Toler*, the Fourth Circuit confronted the issue of whether to group counts under § 2252(a)(1) (shipping child pornography in interstate commerce) with counts for transporting juveniles in interstate commerce for prostitution or sexual activity, 18 U.S.C. § 2423. The Fourth Circuit refused to group the offenses, concluding that the victim under § 2423 was the child, while the primary victim under § 2252(a)(1) "is the harm to the moral fabric of society at large." *Id.* at 403.

Reviewing the legislative history of 18 U.S.C. § 2252(a)(2) leads us to a contrary conclusion. The *Toler* court properly noted that the Senate report expressed grave concerns about the effect of child prostitution and pornography on the nation's moral fabric. *Toler*, 901 F.2d at 403 n. 5. There can be no doubt that child pornography and child prostitution foster an ill on society. Many abused children become abusers themselves, thus continuing the vicious cycle. S.Rep. No. 95–438, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S.Code Cong. & Admin. News 40, 46. In fact, the committee concluded that "the use of children as prostitutes or as the subjects of pornographic materials is very harmful to both the children and the society as a whole." *Id.* at 43.

■■■ But merely because the exploitation of these children has a secondary effect on society at large does not diminish the fact that the primary victim in this crime is the child. In fact, the committee report quoted a resolution from the Committee on Human Resources urging the Judiciary Committee to hold hearings on this issue because of a "deep and abiding concern for the health and welfare of the children and youth of the United States." *Id.* at 41. Moreover, the Senate report added:

---

**4.** While the sentence fell within both guidelines ranges, this issue is not moot because the district court did not state that it would have given

the same sentence regardless of whether the counts were grouped or not. *See United States v. Khang*, 904 F.2d 1219, 1225 (8th Cir.1990).

Of deep concern to the Committee is the effect of child pornography and prostitution on the children who become involved. Generally they are highly vulnerable children in the first place, making them easy prey.

Frequently they are victims of child abuse, or of broken homes, or of parents who simply do not care. Such children have no self-pride or confidence and very little resistance. An offer of money, food, or shelter, or even a few friendly words or a show of concern can lead them, unquestioning, into the hands of exploiters for purposes of pornography or prostitution. Where there was no love or encouragement in their lives before, they finally achieve approval, encouragement and money for sexual favors.

Such encounters cannot help but have a deep psychological, humiliating impact on these youngsters and jeopardize the possibility of healthy, affectionate relationships in the future. Indeed such children often grow up in an adult life of drugs and prostitution. Even more tragic, however, is the fact that many adults who were molested as children tend to become child molesters themselves, thus continuing the vicious cycle.

*Id.* at 46. From this, we have no trouble concluding that the primary victim under 18 U.S.C. § 2252(a)(2) is the exploited child. Since the two counts against Rugh involved separate mailings of photographs of different children, we find that different victims were involved and grouping would have been inappropriate under § 3D1.2. Moreover, the fact that Rugh received the pictures on different occasions requires a finding of separate crimes because it is the act of shipping or receiving the pornography that is the focus of 18 U.S.C. § 2252(a)(2). *United States v. Cipollone,* 951 F.2d 1057, 1058 (9th Cir.1991) (per curiam).

## II.

For the foregoing reasons, the judgment of the district court is affirmed.