In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2961

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GEORGE SHERMAN,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 194--Blanche M. Manning, Judge.

ARGUED JANUARY 18, 2001--DECIDED October 11, 2001


   Before CUDAHY, KANNE and ROVNER, Circuit
Judges.

   ROVNER, Circuit Judge. George Sherman
pled guilty to one count of receiving
child pornography that had been mailed,
shipped and transported in interstate or
foreign commerce, in violation of 18
U.S.C. sec. 2252A(a)(2)(A). He stipulated
to conduct charged in two other counts,
including (1) mailing, transporting and
shipping child pornography in interstate
or foreign commerce, in violation of 18
U.S.C. sec. 2252A(a)(1); and (2)
possessing videotapes and other material
containing images of child pornography,
which had been mailed, shipped, and
transported in interstate or foreign
commerce, in violation of 18 U.S.C. sec.
2252A(a)(5)(B). The district court
declined to group the counts together for
sentencing purposes, and sentenced him to
30 months' imprisonment. Sherman appeals,
and we affirm.

I.

   For several months in 1998, George
Sherman corresponded with an individual
by the name of Jason who resided in
Canada. In September of that year, he
mailed an envelope containing a letter
and a videotape from Chicago to Jason in
Ontario. The letter stated, "Here's your
tape. Hope you enjoy it, Where's the TAPE

that you are sending me???" The videotape contained approximately six hours of footage, and roughly 70% of the tape depicted minors, including prepubescent minors, engaged in sexually explicit activity. Canadian postal inspectors seized this tape, and alerted authorities in the United States. Although Sherman was not arrested at that time, this seizure eventually resulted in Count One of the indictment, which charged Sherman with knowingly mailing, transporting and shipping child pornography in interstate or foreign commerce, in violation of 18 U.S.C. sec. 2252a(a)(1).

Having been alerted by Canadian officials, the United States Customs Service searched Sherman's Chicago apartment in December 1998. The Customs Service recovered eight additional videotapes which also contained images of prepubescent minors engaged in sexually explicit activity. Again, Sherman was not arrested at that time, and this seizure resulted in Count Two of the indictment, charging Sherman with knowingly possessing videotapes and other material containing child pornography, which had been mailed, shipped and transported in interstate or foreign commerce, in violation of 18 U.S.C. sec. 2252A(a)(5)(B).

Apparently, the Customs Service was not the only agency that had been alerted to Sherman's interest in child pornography. The Federal Bureau of Investigation asked the United States Postal Inspection Service to conduct an investigation of Sherman's involvement in child pornography. The record does not reveal the source of the FBI's suspicions about Sherman, except to state that this investigation was entirely independent of any action by Canadian authorities or the Customs Service. At the FBI's instigation, an agent of the Postal Inspection Service conducted an undercover investigation of Sherman. The agent mailed a letter to Sherman, introducing himself as "Lou and Ann," the owners of "Foreign Films Etcetera," a business specializing in visual materials "very much outside the norm." The introductory letter apparently piqued Sherman's interest and after a series of letters back and forth, he ordered a video and a photo set from "Lou and Ann," enclosing his payment with the order. The

video was titled "Boys-3." According to the brochure sent by the fictional "Lou and Ann," the video contained sexual activity between two boys aged 12 and 13. The photo set was titled "Chicken For Hire" and portrayed, according to the promotional materials, "uninhibited boys aged 8 to 15," engaged in various sexual acts. Sherman also filled out a "sexual interests survey" for "Lou and Ann," checking off as areas of interest the categories of "chickenhawk" and "incest," among other things./1 On a blank line for "special requests," Sherman wrote "young, underage." He also indicated an interest in buying and trading materials. "Lou and Ann" had expressly warned Sherman that some of the materials they sold were "very illegal."

In March 1999, the agent prepared a controlled delivery of the materials that Sherman ordered. Sherman signed a delivery receipt for the materials and accepted the package. When law enforcement officers searched his apartment a short time later, they found the opened photo set under the cushion of a living room chair. They found the video in the kitchen in Sherman's oven, along with a copy he had already made in the short time he possessed the materials. They also recovered a number of videotapes containing images of nude, underage males. This time, Sherman wasarrested and this latest conduct resulted in Count Three of the indictment, charging him with knowingly receiving child pornography that had been mailed, shipped and transported in interstate or foreign commerce, in violation of 18 U.S.C. sec. 2252A(a)(2)(A).

Sherman pled guilty to Count Three, and stipulated to the conduct charged in Counts One and Two. The probation officer preparing the Presentence Investigation Report (the "PSR") wrote that, because Sherman's criminal conduct "consists of separate harms and separate victims, [the counts] cannot be grouped together under any of the subsections contained in sec. 3D1.2, for the purpose of guideline calculation." PSR at 8. Sherman objected to this finding and argued in the district court that all three counts of the indictment involved the same victim under sec. 3D1.2. According to Sherman, the definition of "victim" provided in

that section does not include secondary or indirect victims, and Sherman maintained that for the crimes of shipping, possessing and receiving child pornography, the main victim is society rather than the children involved in the production of the materials. Sherman conceded that for the crime of producing these materials, the children exploited in the production are the primary victims, but that he was merely a passive viewer who caused no additional harm to the children involved. The district court rejected that argument, refused to group the counts for sentencing purposes, and ordered Sherman imprisoned for 30 months. Sherman appeals.

II.

United States Sentencing Guideline sec. 3D1.2 provides, in relevant part:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

. . . .

(b)  When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
Application Note 2 of the Commentary to Guideline sec. 3D1.2 provides:

The term "victim" is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the "victim" for purposes of subsections (a) and (b) is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related. . . . Ambiguities should be resolved in accordance with the purpose of this section as stated in the lead paragraph, i.e., to identify and group "counts involving substantially the same harm."

In this case of first impression in the Seventh Circuit, we must decide who is the primary or direct victim of the crimes of shipping, possessing and receiving child pornography. A number of circuits have weighed in on the issue and there is a split in the result. The split heavily favors the government's position that the children portrayed in the material are the primary victims of these crimes. Only one circuit has decided that society is the primary victim in these circumstances. We will review the cases from our sister circuits before turning to Sherman's arguments and the government's response.

A.

The Fourth Circuit was the first to consider who is the primary or direct victim of the crime of transporting child pornography in interstate commerce. United States v. Toler, 901 F.2d 399 (4th Cir. 1990). In addition to a single sec. 2252A count of transporting child pornography in interstate commerce, Toler was charged with two counts of interstate transportation of a minor with intent to engage in prohibited sexual conduct, in violation of 18 U.S.C. sec. 2423. The child depicted in the pornography was Toler's 12-year-old stepdaughter, and she was the same child Toler transported across state lines with intent to engage in prohibited sexual conduct. 901 F.2d at 400. The district court declined Toler's invitation to group the three offenses for sentencing purposes under sec. 3D1.2, and the Fourth Circuit affirmed. Id. The appellate court found that the primary interest sought to be protected in a sec. 2423 offense, transporting a minor across state lines with the intent to engage in prohibited sexual conduct, is that of the individual minor. The victim of that offense was therefore Toler's stepdaughter. 901 F.2d at 403. In contrast, the court found that the primary interest Congress sought to protect in sec. 2252A was the moral fabric of society at large. Id. The court found that the minor depicted in the pornography was a secondary victim of the crime. The court based this conclusion on the legislative history of sec. 2252A, which states, in part, that "the use of children as prostitutes or as the subjects of pornographic materials is very harmful to both the children and the

society as a whole." 901 F.2d at 403 n.5. Because the counts were not grouped, Toler's combined offense level was increased three levels under sec. 3D1.4, and his resulting sentence was lengthened.

   Every court to consider the issue since Toler has rejected the Fourth Circuit's reasoning. The Eighth Circuit faced the issue in United States v. Rugh, 968 F.2d 750 (8th Cir. 1992). Rugh was charged with two counts of receiving child pornography through the mail in violation of 18 U.S.C. sec. 2252(a)(2). The pictures Rugh received on two different occasions depicted different children. 968 F.2d at 755. Relying on Toler, Rugh argued that the two counts should be grouped because both involved the same victim, society at large. The Eighth Circuit noted that, although Congress expressed grave concerns for the effect of child pornography on the nation's moral fabric, the legislature's primary concern was for the children involved in the production of the materials. 968 F.2d at 755. Citing the legislative history of sec. 2252, the court found that the primary victim of the crime of receiving child pornography was the exploited child portrayed in the materials. 968 F.2d at 756. In particular, the court cited the Senate report on the law, which detailed the harms that come to children involved in the production of pornography. Among these harms, the report noted, is the "deep psychological, humiliating impact on these youngsters," which "jeopardize[s] the possibility of healthy, affectionate relationships in the future." Id. The report also noted the increased likelihood that children who were molested would grow up to engage in a life of drugs and prostitution, as well as becoming molesters themselves, perpetuating the cycle of abuse. Id. The court did not draw a distinction between the harms caused by the production of the materials and the harms caused by its distribution and receipt by persons not involved in the production. Rather, the court concluded that the primary victim of the crime of receiving child pornography is the child depicted. Therefore, the two counts could not be grouped under sec. 3D1.2.

   The Third Circuit also was "not persuaded by the Fourth Circuit's"

reasoning in Toler. See United States v. Ketcham, 80 F.3d 789 (3d Cir. 1996). Ketcham pled guilty to multiple charges, including transporting, receiving, distributing, reproducing and possessing child pornography. 80 F.3d at 791. As with Rugh, Ketcham was not accused of any crime involving the production of the materials at issue, and thus he had no direct contact with the children exploited in making the materials. Different children were depicted in the various pictures and films seized by authorities. 80 F.3d at 792. As with Rugh, Ketcham asserted that the multiple counts should be grouped under sec. 3D1.2 because they involved the same victim, society at large. The court reviewed the legislative history, and concluded that the primary concern of Congress in passing the measure was to protect children. The court noted,

This is not a statute where there is no identifiable victim. The fact that a criminal statute in a general sense protects society as a whole cannot suffice to make society the primary victim. Were this the case, society would be the primary victim of nearly every criminal statute.

80 F.3d at 793. Ketcham conceded that the direct victim of sec. 2251, which criminalizes the production of child pornography, is the child used in the production. He sought to distinguish the crimes of transporting, distributing and receiving. The court rejected any distinction, finding that sec. 2252 discourages the production of pornography by depriving the would-be producers of a market. Id. Thus, the court reasoned, the primary objective of both sec. 2251 and sec. 2252 was the same, to protect children from exploitation by the producers of child pornography. The court held that, therefore, the victims of both sections are the same. Id.

The Ninth Circuit also declined to draw any distinction between the crime of producing child pornography and the crimes of distributing or receiving child pornography in determining who was the primary or direct victim of the crime. United States v. Boos, 127 F.3d 1207 (9th Cir. 1997), cert. denied, 522 U.S. 1066 (1998). The court remarked that distributing child pornography differs

from drug and immigration offenses. The court characterized those crimes as "victimless," and noted that the harm from drug and immigration offenses is spread evenly throughout society. 127 F.3d at 1210. The harm caused by the distribution of child pornography, on the other hand, is concentrated on the children used in the production of the material. Id. Using a dictionary definition of "victim," the court found that it was the children used in the production of the pornography who were injured, both physically and psychologically as a result of Boos' patronage of the industry. The court also relied on the legislative history, which refers repeatedly to the children used in the production of pornography as victims. 127 F.3d at 1211.

The court in Boos was the first to address the particular additional harm visited on these children by the distribution of the offending material. Citing the Supreme Court's opinion in New York v. Ferber, 458 U.S. 747 (1982), the Ninth Circuit acknowledged the direct harm that arises through distribution:

The distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children. . . . [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation.

Boos, 127 F.3d at 1211 (quoting Ferber, 458 U.S. at 759). The court went on to describe the harm to the children depicted as a "trespass against the dignity of the child." 127 F.3d at 1212 (citing United States v. Wiegand, 812 F.2d 1239, 1245 (9th Cir. 1987), cert. denied, 484 U.S. 856 (1987)). Indeed, the Ninth Circuit had recently ruled that children are the direct victims of a sec. 2423(b) violation (interstate travel with intent to engage in a sexual act with a minor) even if no real children were involved and the charges were the result of a police sting using fictional children. Under all of those rationales, the court found that the children depicted in pornography are the primary victims of the crime of distributing that material. Boos, 127 F.3d at 1212.

Two other circuit courts quickly followed suit. The Sixth Circuit, relying entirely on the rationales set forth in Ketcham and Boos, found that the children depicted in the pornography possessed and shipped by a defendant are the primary victims of the crimes of possession and distribution. United States v. Hibbler, 159 F.3d 233, 236-37 (6th Cir. 1998), cert. denied, 526 U.S. 1030 (1999). The Fifth Circuit looked first to a dictionary definition of "victim" and then specified the harm that occurs after "the pornographer's camera is put away." United States v. Norris, 159 F.3d 926, 929 (5th Cir. 1998), cert. denied, 526 U.S. 1010 (1999). First, citing the "permanent record" language of Ferber, the court held that the dissemination of the images perpetuates the abuse initiated by the producer of the material. In particular, the continued existence of the material haunts these children in future years. Norris, 159 F.3d at 929-30. Thus, a "passive" consumer who merely receives or possesses the images directly contributes to this continuing victimization. 159 F.3d at 930.

Second, "the mere existence of child pornography represents an invasion of the privacy of the child depicted." Id. Citing both the Supreme Court and the Congressional Record, the court explained that distribution of the material violates an individual's interest in avoiding disclosure of personal matters, as well as the child's reputationalinterests. 159 F.3d at 930 (citing Ferber, 458 U.S. at 759 n.10 and 1996 Act, 110 Stat. at 3009-26). Third, the court found that the consumers of child pornography instigate its production by providing an economic motive for creating and distributing the materials. Norris, 159 F.3d at 930. Characterizing the situation as a "chicken-and-egg scenario," the court suggested it was impossible to determine who was responsible for the initial production of the materials, the consumers or the producers, since neither would existwithout the other. Id. The court concluded that the children depicted were the primary victims of the crimes of receiving and possessing child pornography. 159 F.3d at 931.

Most recently, the Eleventh Circuit has

joined the growing number of courts that reject Toler and instead interpret the legislative history to find that the children depicted in pornography are the primary victims of the crimes of possessing, receiving and distributing those materials. See United States v. Tillmon, 195 F.3d 640 (11th Cir. 1999). Although acknowledging that the production of pornography may be more immediately harmful to the child involved, the court found that the dissemination of the material exacerbates the harm by continuing to invade the privacy of the child and by providing the very market that led to the creation of the images in the first place. 195 F.3d at 644.

B.

   Sherman and the government are in agreement that we review de novo the district court's refusal to group the counts under sec. 3D1.2 when there are no facts in dispute. United States v. Wilson, 98 F.3d 281, 282 (7th Cir. 1996). Sherman argues that the three counts of his indictment all involve the same victim, society at large, and therefore the district court should have grouped the counts for sentencing purposes. He maintains that a private, passive viewer of child pornography does not directly victimize the children depicted in the materials within the plain meaning of sec. 3D1.2. He points out that the district court focused on the so-called market maker theory of victimization. That is, the district court believed Sherman harmed these children by creating a market demand for the production of child pornography. The district court then characterized this harm as "indirect," concluding that no one would make the videos or photo sets if there were no buyers for the materials. According to Sherman this is not enough, especially in light of the government's failure to produce evidence demonstrating that Sherman's desire to watch pornography encouraged the production of the videos and photo sets found in his possession. Sherman also complains that, had he obtained all of the materials in a single transaction, he would have been charged in a single count. This last complaint is odd in light of the fact that he was charged not with being a passive viewer or mere possessor of

pornography but rather with three different crimes: possessing, receiving, and shipping child pornography, all occurring on three different dates in distinctly different transactions. Thus, his observation that he would have been charged in a single count if he had obtained all the materials in a single transaction is true, but completely irrelevant.

The more serious of Sherman's arguments is his challenge to the market maker theory of victimization. The government cites Osborne v. Ohio, 495 U.S. 103 (1990), in support of its argument that purchasers of pornography create a market incentive to produce pornography. In Osborne, the Supreme Court weighed the state's interest in criminalizing pornography against a person's First Amendment right to possess it. The Court concluded that Ohio enacted its law to protect the victims of child pornography by attempting to destroy the market for the exploitative use of children. Specifically, the Court held it was "reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand." 495 U.S. at 109-10. Destroying the market is certainly a strong enough link to justify criminalizing possession of the material, but here we are confronted with an additional requirement. The sentencing guideline requires us to identify the "primary" or "direct" victim of the crimes of possession, receiving and shipping child pornography. The market maker theory provides only an indirect link between a particular child used in the production of pornography and a later purchaser or possessor of that material. We agree that because sec. 3D1.2 precludes the consideration of indirect harm, the market maker theory is a thin reed on which to rest the grouping decision. Although creating a market for the materials certainly victimizes the children involved, we cannot say that the purchaser directly harms the children involved. We would have a different case if the defendant commissioned the production and was more directly involved in the harm to the particular children portrayed in the materials. But because the creation of a market demand is more indirect than the guideline seems to

contemplate, we do not rest our decision on the market maker theory of victimization.

Instead, we turn to the other main rationale expressed by our sister circuits, and supported by related Supreme Court precedent. The possession, receipt and shipping of child pornography directly victimizes the children portrayed by violating their right to privacy, and in particular violating their individual interest in avoiding the disclosure of personal matters. See Ferber, 458 U.S. at 759 n.10 (citing Whalen v. Roe, 429 U.S. 589 (1977)). In Ferber, the Supreme Court upheld a New York statute that prohibited a person from knowingly promoting a sexual performance by a child under the age of 16 by distributing material which depicted such a performance. In setting out the state's interest in criminalizing this activity, the Supreme Court delineated the harm that comes to the children depicted when pornography is possessed or distributed:

Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place. A child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography.

458 U.S. at 759 n.10 (quoting Shouvlin, Preventing the Sexual Exploitation of Children: a Model Act, 17 Wake Forest L. Rev. 535, 545 (1981)). Children also suffer profound emotional repercussions from a fear of exposure, and the tension of keeping the abuse secret. 458 U.S. at 759 n.10 (citing Schoettle, Child Exploitation: A Study of Child Pornography, 19 J. Am. Acad. Child Psychiatry 289, 296 (1980)). Indeed, one of the reasons for criminalizing the "mere" possession of child pornography is to create an incentive for the possessor to destroy the material, and alleviate some of these harms to the children depicted. Osborne v. Ohio, 495 U.S. 103, 111 (1990) ("The State's ban on possession and viewing encourages the possessors of these materials to destroy them."). Cf. United States v. Richardson, 238 F.3d 837, 839 (7th Cir. 2001) ("Concern with the welfare of the

children who are used to create pornography is part of the public concern over child pornography, . . . and this makes the receiver a greater malefactor than the possessor.").

Sherman argues that if we hold that the invasion of privacy is a direct harm to the child depicted, then the government could charge him in a separate count for each viewing of a pornographic videotape. This allows the government too much discretion in charging the crime, he maintains. Although the child's inability to prevent the dissemination of something so personal as a record of sexual abuse is a direct harm, Sherman was not charged with viewing this material. Rather, he was charged with shipping, receiving and possessing the materials. The statute under which he was charged does not separately criminalize viewing the materials, and so Sherman's hypothetical "multiple viewing" charging problem is without substance. See 18 U.S.C. sec. 2252A. Sherman also fears the government could charge him with twenty counts of child pornography if he possessed a tape depicting twenty different children. Again, the crime is possessing that single tape, and that possession constitutes one count regardless of the number of children portrayed. The fact that there are multiple victims of a single count may have other sentencing consequences that we need not consider today.

Because the children depicted in the pornography suffer a direct and primary emotional harm when another person possesses, receives or distributes the material, we join the six circuits that have concluded that these counts should not be grouped under sec. 3D1.2. Although society at large is also a victim of these crimes, the primary, identifiable victim is the child portrayed, who must live with the knowledge that adults like George Sherman can pull out a picture or watch a video that has recorded the abuse of that child at any time./2

C.

We have one more issue to address because the government and this Court have taken a contrary position in the past. The government argues here, and we agree, that the possession of child

pornography directly harms the child depicted by invading that child's privacy. But in the past, the government has defended its investigative technique against charges of outrageous conduct by claiming that no children are harmed when the government possesses and supplies a suspect with previously seized child pornography. In the past, we accepted that view and held that no third parties were harmed in that instance. See United States v. Duncan, 896 F.2d 271, 276 (7th Cir. 1990) ("there was no injury to innocent third parties as the government merely sent Duncan copies of previously seized child pornography."); United States v. Thoma, 726 F.2d 1191, 1199 (7th Cir. 1984), cert. denied, 467 U.S. 1228 (1984) (no harm to third parties when government allowed defendant to videotape photographs of children from already seized publications). Our holding today is in tension with our holdings in the outrageous conduct cases. Because we are finding today that third parties may be directly harmed by the defendant's possession of child pornography supplied to him by the government in the course of its investigation, we have circulated this opinion to the full court for a vote on whether to hear the case en banc pursuant to Circuit Rule 40(e). A majority of the court has voted not to hear the case en banc.

Under our holding today, the government's own possession of and dissemination of child pornography during the investigation of Sherman resulted in an invasion of privacy of the children depicted. The government here supplied Sherman with a literal catalog of child pornography, and then delivered to him materials that depicted actual children, allowing him enough time to view and even copy the materials before arresting him. Recall that Sherman had already duplicated the videotape that the government shipped to him before he was arrested. Indeed, in this electronic age, Sherman would have had enough time to scan the photo sets into a computer and send them anywhere in the world, where it is unlikely they could have ever been re trieved and destroyed. We questioned the government about this conduct at oral argument, and the government replied that in the course of undercover investigations, the government sometimes participates in crimes in order to serve

the larger purpose of preventing further crimes. We find this explanation troublesome for two reasons. First, the government's participation in criminal activity in the course of an investigation should rarely, if ever, involve harming actual, innocent victims. See Duncan, 896 F.2d at 276 (we will closely examine those cases in which government misconduct injures third parties in some way); Thoma, 726 F.2d at 1199 (same). We are aware of the necessity of such tactics in so-called victimless crimes such as drug offenses, but the use of these methods when victims are actually harmed is inexplicable. Moreover, the government's dissemination of the pornographic materials to Sherman could hardly be described as a "controlled" delivery of the materials. Given the length of time that Sherman was allowed to possess these materials before he was arrested, the government's conduct here could easily have led to further victimization of the children depicted because the defendant had an opportunity to copy the materials and disseminate them to others. But the defendant did not complain about the government's conduct here, and we of course have held that the defense of outrageous government conduct does not exist in this circuit. United States v. Boyd, 55 F.3d 239, 241 (7th Cir. 1995).

Many courts have noted that child pornography is a difficult crime to detect because it occurs under a shroud of secrecy. Duncan, 896 F.2d at 276; United States v. Osborne, 935 F.2d 32, 37 (4th Cir. 1991) ("undercover operations provide a means by which participants in the clandestine child pornography industry can be detected."); United States v. Moore, 916 F.2d 1131, 1139 (6th Cir. 1990) ("undercover operations are severely needed to prevent and deter those who produce, sell, purchase or traffic in child pornography."); United States v. Musslyn, 865 F.2d 945, 947 (8th Cir. 1989) (undercover sting operations are justified by the nature of the production, distribution and sales of child pornography). There is no easy answer to the problem of ferreting out child pornographers without hurting actual children in the process. But we are troubled by certain parts of this investigation where the government might have done a better job of protecting the

children victimized by pornography. First, the government offered no explanation for why Sherman was not arrested when Canadian authorities seized the first tape he mailed to Jason in Canada in September of 1998, or for that matter, why he was not arrested after a second seizure of child pornography in December of 1998. Second, the government's right hand apparently did not know what its left hand was doing, as both the U.S. Customs Service and the U.S. Postal Inspection Service (in conjunction with the FBI) carried on independent investigations of Sherman for some time. This duplication of effort led to the Postal Inspection Service supplying Sherman with additional child pornography when the government had already seized illegal materials from him on two prior occasions. Third, the so-called controlled delivery of photo sets and a videotape in March 1999 allowed the defendant an unnecessarily lengthy amount of time to view and copy the materials before his arrest. As we pointed out, he could have scanned the images into a computer and disseminated them worldwide. Law enforcement agents are understandably motivated to use all legal means at their disposal to apprehend and convict criminals, and the pursuit of child pornographers, whose crimes are particularly heinous, predictably results in aggressive law enforcement techniques. But we must not lose sight of the risk of harming the innocent third parties that the law was enacted to protect. See United States v. Chin, 934 F.2d 393, 400 (2d Cir. 1991) (cautioning law enforcement to think twice before engaging in investigations that encourage individuals to commit actions that harm innocent third parties). We have no doubt that creative investigative techniques and tight controls on the materials used as bait for the consumers of child pornography can lead to better protection of the victims of child pornography. We do not mean by this discussion to resurrect the defense of outrageous government conduct, and we reaffirm our holding in Boyd that no such defense is available in this circuit. See Boyd, 55 F.3d at 241. We merely wish to caution the government that its investigative technique in this case was inconsistent with its position on appeal that the children depicted are harmed by the continued existence of and mere

possession of child pornography.

III.

Sherman does not contest the government's claim that different children were depicted in the materials involved in each of the three counts. Thus, each count had a different primary victim, and the district court was correct to decline to group the counts for sentencing purposes under sec. 3D1.2. For the reasons stated above, we thus affirm the judgment of the district court.

AFFIRMED.

FOOTNOTES

/1 "Chickenhawk" refers to a category of pornography involving older adult males who have a sexual interest in very young or underage males. The young or underage males are referred to as "chickens," while the older men are "hawks."

/2 The Supreme Court recently granted certiorari in Free Speech Coalition v. Reno, 198 F.3d 1083 (9th Cir. 1999), a case which held that part of the child pornography statute is unconstitutionally vague and overbroad. In particular, the Ninth Circuit found that the language criminalizing images that appear to be of a minor or convey the impression of being child pornography was too vague and overbroad to be sustained under First Amendment scrutiny. The Ninth Circuit posited that when no actual children were used in the creation of the pornography, the effect was censorship for the purpose of controlling an evil thought, an insufficient rationale under the First Amendment. 198 F.3d at 1094-97. The Ninth Circuit seems to imply that there is no victim when the images are computer-generated. To the extent the Supreme Court decides otherwise, that may help shape the idea of who is a victim of child pornography. But whether the Supreme Court finds that society is a victim of virtual child pornography is not necessarily dispositive of who the primary, direct victim is here, where we have real, identifiable prepubescent minors depicted.

Posner, Circuit Judge, with whom Manion, Circuit Judge, joins, dissenting from the denial of hearing en banc./1 This case is well worth the attention of the full court. It requires us to consider why child pornography, a growing subject of federal criminal prosecution, has been crim-

inalized. It is true that the constitutionality of a statutory provision similar to the one under which the defendant was convicted is now before the Supreme Court, see Free Speech Coalition v. Reno, 198 F.3d 1083 (9th Cir. 1999), cert. granted under the name Ashcroft v. Free Speech Coalition, 121 S. Ct. 876 (2001), but that is an argument at most for granting hearing en banc but postponing the hearing till the Court's decision is handed down; for it is entirely possible that the decision, if it reverses the Ninth Circuit, will have no effect on our case.

The panel opinion answers the question I have put of why child pornography is criminal by saying that Congress wants to protect the children who are used in the production of such pornography; other concerns to which such pornography might give rise are not identified by the panel and are dismissed by it as distinctly secondary. The government in its brief goes so far as to state that the children used in the production of pornography are "the victims" of child pornography, period, the implication being that Congress had no other consequences of child pornography in mind in deciding to criminalize it. This is a complete misunderstanding of the statute under which Sherman was convicted, 18 U.S.C. sec. 2252A, as is evident from the text and the legislative history, S. Rep. No. 358, 104th Cong., 2d Sess. (1996), both of which the government considerately printed in the appendix to its brief.

Sherman was convicted of three counts of possessing child pornography. Each count involved photographs of different children, but he asked that the counts be "grouped" for purposes of sentencing. The federal sentencing guidelines forbid grouping unless the counts involve "the same victim." U.S.S.G. sec. 3D1.2(b). Application Note 2 to this guideline explains that "the term 'victim' is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim. For offenses in which there are no identifiable victims (e.g., drug or immigration offenses, where society at large is the victim), the 'victim' . . . is the societal interest that is harmed. In such cases, the counts are grouped together when the societal interests that are harmed are closely related." There's a bit of a logical gap here; "secondary victims" are not to be considered in deciding whether to group offenses but on the other hand it is implied that this is true only if there are no identifiable victims--yet secondary victims might be identifiable. Since drug and immigration offenses, as I'm about to show, often do have identifiable second-

ary victims yet are offered as paradigmatic examples of "groupable" offenses, I believe that if the child pornography offense in section 2252A of the federal criminal code is like the drug offenses in the code, the primary "victim" is society at large. And as it is the same victim in all three counts, Sherman is entitled to have them grouped (with what effect on his sentence the briefs do not say) without regard to the presence of identifiable secondary victims.

I think that the offense in section 2252A is more like a drug offense than it is like such offenses as murder and robbery, with their clearly identifiable "primary" victims, and that the children used in the pornography are merely the secondary victims, much like many of the people employed in the drug trade--the "mules" who die when the bags of cocaine that they've swallowed burst, the wives and girlfriends who are roped into assisting their husbands or boyfriends in the drug trade, the drug dealers killed in gang wars, and the addicts who turn to selling drugs to support their habit. Nominally, most of these are "consenting adults," but, realistically, many are coerced or inveigled into criminal participation. Yet the principal concern behind the criminalization of drug dealing is not with any of these unfortunates; it is with the consumption of the drugs and with the entire range of consequences thought to flow from that consumption. Similarly, many illegal immigrants are abused, sometimes even enslaved, by employers or by the traffickers in illegal immigrants, but the chief concern behind the restrictions on immigration is not with those unfortunates but with the effect of unrestricted immigration on citizen employment, on crime, and on welfare and other government programs.

The adult men and women who perform in pornographic films may be degraded, exploited, and therefore victimized by their participation in the production of pornography, as argued in Catharine A. MacKinnon, Only Words (1993), but they are not the primary victims. No more are the children used in the production of pornography the primary victims, at least in the judgment of Congress. We know this from the fact that as part of the Child Pornography Prevention Act under which Sherman was convicted Congress amended the definition of child pornography to make clear that it includes pornography created by means of realistic computer simulations or by using adults made up to look like children. See 18 U.S.C. sec. 2256(8), which defines "child pornography" for purposes of section 2252A. Congress did not prescribe a lesser sentence for child pornography the production of which does not involve the use of children; the sentencing provisions of the

statute are the same regardless of whether chil-
dren are used. And 18 U.S.C. sec. 2255 creates a
private civil remedy for children who are victims
of violations of the various child-pornography
statutes, expressly including section 2252A; most
of these are children molested by people like
Sherman who traffic in or purchase pornographic
images, as distinct from the children used in the
making of those images.

The Senate Report, which the government treats
as authoritative regarding the purpose of the
statute, states that "computer-generated child
pornography poses the same threat to the well-
being of children as photographic child pornogra-
phy," S. Rep. No. 358, supra, at 15 (emphasis
added). This statement would be nonsense if the
government's brief were correct in saying that
"the victims" of child pornography are the chil-
dren used in the making of it. The Senate Report
makes clear that the principal concern behind
criminalizing child pornography is the fear that
it incites child molestation; and both "the
effect of visual depictions of child sexual
activity on a child molester or pedophile using
that material to stimulate or whet his own sexual
appetites" and "the danger to children who are
seduced and molested with the aid of child sex
pictures [are] just as great when the child
pornographer or child molester uses visual depic-
tions of child sexual activity produced wholly or
in part by electronic, mechanical, or other
means, including by computer, as when the materi-
al consists of unretouched photographic images of
actual children engaging in sexually explicit
conduct." Id. at 2. From the parity of concern
that the statute and the legislative history
express with respect to simulated and actual
pornography we can infer that the primary victim
is not the child used in the pornography but the
child seduced or molested by a pedophile stimu-
lated by such pornography. And not just that
child, but the adult population; for we should be
realistic and acknowledge that sheer disgust at
people who have a sexual interest in prepubescent
children is a principal motivation for such
legislation. This is further evidence that the
children used in the making of child pornography
are not the primary victims, that the primary
victims are a larger and more diffuse group, as
in the case of drug and immigration offenses; or
so at least that this is what Congress believes,
which is all that matters. What the actual conse-
quences of child pornography are I do not know;
maybe the primary victims are the children used
to make such pornography (maybe, for that matter,
they are the only victims--maybe child pornogra-
phy is a sex substitute rather than an
incitement-- apart from disgusted adults). That
is not the issue. The issue is whom the statute

deems the primary victims to be. Of that there is little doubt.

Since the children used in making child pornography are victims, albeit not the primary victims in the eyes of Congress, it may seem paradoxical to argue that merely because there are other victims Sherman should get a lighter sentence through grouping. But grouping is necessary to avoid results that I am sure even my colleagues on the panel would regard as absurd. In United States v. Richardson, 238 F.3d 837, 839 (7th Cir. 2001), the defendant had downloaded more than 70,000 separate photographic images of child pornography--if a different child had been used to make each of those images, would that mean that there were 70,000 separate victims of the defendant? Granted, extra counts can never require the addition of more than five additional offense levels. U.S.S.G. sec. 3D1.4. But the background note to this guideline suggests that the presence of additional victims may warrant the sentencing judge in departing upward from the guideline sentence. The result would be the imposition in many and perhaps most cases of the statutory maximum penalty (15 or 30 years, depending on whether the defendant is a recidivist, 18 U.S.C. sec. 2252A(b)(1)), if the analysis by the panel is correct.

One last point: At the end of its opinion, the court warns the government against using child pornography in stings of suspected violators of the child pornography statutes, since the sting inflicts on the children used in the pornography the same "haunting" injury (the embarrassment to the child, perhaps after he has grown up, of being recognized in a pornographic image by people who know him) that is one of the ways in which child pornography is believed to harm the children used in its production. The warning is empty, since, as the court recognizes, we have no authority to reverse a conviction because of governmental misconduct unless the defendant's rights are violated, not the rights of third parties.

FOOTNOTE

/1 I am authorized to state that Judge Evans joins the final paragraph of this dissent.